In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 14-3723 & 15-1187

CONTEMPORARY CARS, INC. doing business as MERCEDES-BENZ OF ORLANDO and AUTONATION, INC., single and joint employers,

*Petitioners/Cross-Respondents,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner,*

*and*

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS,

*Intervening-Respondent.*

Petition for Review and Cross-Application
for Enforcement of a Decision and Order of
the National Labor Relations Board
Nos. 12-CA-026126, 12-CA-026233, 12-CA-026306,
12-CA-026354, 12-CA-026386 & 12-CA-026552

ARGUED SEPTEMBER 24, 2015 — FEBRUARY 26, 2016

———————————

Before MANION, ROVNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This case involves a car dealership and its parent company's efforts to frustrate their employees' rights to organize. An administrative law judge found that the petitioner-employers engaged in a series of unfair labor practices aimed at coercing their employees' choices in the run-up to a December 2008 union election and frustrating their employees' protected concerted activities after the election. The judge also found that petitioners fired an employee due to anti-union animus and after the election unlawfully made multiple changes to employees' working conditions without bargaining with the union. The National Labor Relations Board largely affirmed the judge's order. It adopted the judge's findings of fact and all but one conclusion of law, and it expanded one remedy the judge ordered.

The employers have petitioned for judicial review. The Board has cross-petitioned for enforcement of its order. Having reviewed the extensive record of the numerous charges in this case, we deny the employers' petition and enforce the Board's order in its entirety.[1]

Specific issues are numerous. In Parts I and II, we lay out the factual and legal backgrounds relevant to this case. In Part III we review the findings that petitioners violated § 8(a)(1) of the National Labor Relations Act ("the Act") by interfering

---

[1] The union declined to take part in this petition for judicial review.

with their employees' rights to organize a union and to engage in concerted activity for mutual aid or protection. In Part IV we review the finding that petitioners violated § 8(a)(3) of the Act by firing an employee due to anti-union animus. Finally, in Part V we review the findings that petitioners violated § 8(a)(5) of the Act by failing to bargain with the union over changes they made to terms and conditions of employment.

## I.   *Factual and Procedural Background*

Petitioner Contemporary Cars, which we call the "dealership," does business as Mercedes-Benz of Orlando and sells and services cars in Maitland, Florida. Bob Berryhill, the dealership's general manager, is responsible for the dealership's overall operations. Petitioner AutoNation owns the dealership, as well as over 200 other dealerships throughout the United States.

This case focuses on the dealership's service department. The service department had thirty-seven technicians as of October 2008, although it has since shrunk to twenty-five. The dealership divided technicians into three teams, each supervised by a team leader. The dealership paid technicians by the job rather than by the hour: it assigned each service task a specific number of hours—a "book time"—and paid a technician for those hours regardless of how long the job actually took. Thus, if business in the service department was slow, technicians sat idle and took home less pay. A technician's "skill rating," a letter grade from D to A with "diagnostic" technician above A as the highest level, determined earnings per book hour.

Rumors of union organizing at the dealership had been circulating for years. In the summer of 2008, the International Association of Machinists began a campaign in earnest to organize the service technicians. Over the summer, the technicians talked among themselves and held off-site meetings. Technician Anthony Roberts emerged as one leader of this campaign, frequently talking to his fellow employees about the union. The union supporters kept their meetings relatively quiet. Higher levels of dealership management seem not to have known about the union effort, but team leader Andre Grobler must have known. On two occasions over the summer, Grobler commented to a technician that the technician must have been in a rush to get to a union meeting.

In late September 2008, general manager Bob Berryhill found out about the organizing drive. On September 25, he began calling service technicians into his office for individual meetings. During those meetings, Berryhill asked the technicians about the union activity. He also asked them if they had any problems with how things were run at the dealership. According to one technician, Berryhill said he was working on the problems the technician brought up.

On October 3, 2008, the union filed its representation petition. The Board's Regional Director held a hearing, approved the proposed bargaining unit, and an election was scheduled for December 16. The dealership sought review of this determination, and a two-member panel of the Board summarily denied the request.

In the weeks before the election, Berryhill and AutoNation vice president and assistant general counsel Brian Davis held group meetings and distributed literature to "educate" the technicians on the effects of having a union. At one of these

meetings, Davis encouraged employees to call him if they had any concerns that management was not addressing. In the run-up to the election, Davis visited the dealership often. Shortly before the election, he approached one technician to ask how he felt about the union's chances. Team leader Grobler's interrogation of employees also continued. On December 9, one week before the election, general manager Berryhill held an unscheduled meeting on the service shop floor. He announced that the dealership was working on fixing problems the technicians had and that he was replacing two team leaders, Grobler and Oudit Manbahal, with new team leaders.

Like many businesses, the dealership encountered tough economic times in the second half of 2008. From October to November, the service department's gross profit dropped from $414,000 to $295,000. November 2008's profits were the worst the dealership's controller could recall. Sometime in 2008, AutoNation area manager Pete DeVita began talking with Berryhill about "right-sizing" the dealership. In October or November 2008, Berryhill began talking with other managers at the dealership about laying off technician Anthony Roberts, who was then playing a leading role in the union organizing. On December 8, 2008, about a week before the union election, the dealership laid off Roberts, though Roberts had a higher skill rating, more hours, and more seniority than many other technicians. The dealership also laid off one tire technician and one alignment technician at that time.

Throughout the union campaign, one pro-management technician, James Weiss, reported to Berryhill regarding the union effort. The administrative law judge did not credit Weiss's testimony that he engaged in anti-union activity at

management's request, but the judge did credit, and substantial evidence supports, that Weiss reported information to management whether management asked for it or not.

On December 16, 2008, the technicians voted in favor of unionizing, but as explained below, the dealership contested the result. The economic woes continued into 2009, and the service department's decline in business accelerated. In February, without attempting to bargain with the union, the dealership reduced the "book times" for some pre-paid maintenance jobs. According to the dealership, these were "technical corrections" because, previously unnoticed by the dealership, new pre-paid maintenance plans reduced the amount of work required for each job as compared to the prior plans. That spring, also without bargaining, the dealership temporarily suspended the technician skill level reviews it had used to determine rates of pay. Finally, again without bargaining, the dealership laid off four more service technicians in April 2009.

Litigation of the union election has reached the United States Courts of Appeals twice already. After the election, the dealership challenged the certification of the union as the exclusive representative of a bargaining unit consisting of service technicians. In 2009, a two-member panel of the Board affirmed the certification. *Contemporary Cars, Inc.*, 354 NLRB No. 72 (2009). The dealership petitioned for judicial review. The D.C. Circuit held the appeal in abeyance pending the Supreme Court's decision on actions by two-member panels of the Board. In 2010, after the Supreme Court held that the Act requires the Board to decide cases with a minimum of three members, *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 676 (2010), a three-member panel of the Board set aside the 2009 two-member Board ruling. Six days later, the original two

members plus a third issued a new order affirming the Regional Director's determination. *Contemporary Cars, Inc.*, 355 NLRB 592 (2010). In 2012, the Eleventh Circuit enforced the 2010 Board order. *NLRB v. Contemporary Cars, Inc.*, 667 F.3d 1364, 1373 (11th Cir. 2012).

These unfair labor practice proceedings began in 2010 when the Board's general counsel filed a complaint alleging that the dealership and AutoNation had violated sections 8(a)(1), (3), and (5) of the National Labor Relations Act. 29 U.S.C. § 158(a)(1), (3), (5). In 2011, an administrative law judge found after an evidentiary hearing that the dealership and AutoNation had indeed violated the Act by interfering with their employees' protected rights to engage in concerted activity and to organize a union, by firing Anthony Roberts due to anti-union animus, and by failing to bargain with the union over mandatory subjects of bargaining. In 2012, the Board affirmed the administrative law judge's order with only two minor corrections. The Board expanded one remedy ordered by the judge and corrected one conclusion of law, thereby reviving one § 8(a)(1) charge that had been dismissed by the judge. *Contemporary Cars, Inc.*, 358 NLRB No. 163 (2012).

The dealership and AutoNation petitioned to our circuit for judicial review. In 2014, the Supreme Court issued a decision holding that two of the Board members who decided the 2012 case had been appointed unconstitutionally. *NLRB v. Noel Canning*, 573 U.S. —, 134 S. Ct. 2550, 2557 (2014). In light of *Noel Canning*, we vacated the Board's 2012 decision and remanded for further proceedings. In 2014, the Board issued an order consistent with and incorporating by reference its 2012 order. *Contemporary Cars, Inc.*, 361 NLRB No. 143 (2014). This

petition for judicial review and cross-petition for enforcement
followed.

II. *Legal Framework and Standard of Review*

The National Labor Relations Act protects employees'
rights to organize a union and to engage in "concerted activi-
ties for the purpose of collective bargaining or other mutual
aid or protection." 29 U.S.C. § 157. Section 8(a)(1) of the Act
makes it an unfair labor practice for an employer to "interfere
with, restrain, or coerce employees in the exercise" of these
rights. 29 U.S.C. § 158(a)(1). Section 8(a)(3) makes it an unfair
labor practice to discriminate in hiring, "tenure of employ-
ment or any term or condition of employment to encourage
or discourage membership in any labor organization."
§ 158(a)(3). And § 8(a)(5) makes it an unfair labor practice for
an employer to refuse to bargain collectively with the employ-
ees' representative. § 158(a)(5). The Act empowers the Board
to find that a person or company has engaged in unfair labor
practices, and it gives the Board broad discretion to remedy
unfair labor practices to "effectuate the policies" of the Act.
§ 160(a), (c).

The dealership and AutoNation petitioned under § 160(f)
to modify or set aside the Board's order finding that they en-
gaged in unfair labor practices. The Board cross-petitioned
under § 160(e) to enforce its order. We may enforce, modify
and enforce as modified, or set aside in whole or in part the
Board's order. § 160(e), (f).

Our review of a Board order is deferential. We review the
Board's factual findings to see if they are supported by sub-
stantial evidence. *Id.* We consider the entire record and will
affirm if we find "such relevant evidence that a reasonable

mind might accept as adequate to support the conclusions of the Board." *NLRB v. Teamsters "General" Local Union No. 200*, 723 F.3d 778, 783 (7th Cir. 2013) (citation and internal quotation marks omitted). This requires "more than a mere scintilla" of evidence, *International Union of Operating Engineers, Local 150 v. NLRB*, 325 F.3d 818, 828 (7th Cir. 2003) (citation and internal quotation marks omitted), but we do not reweigh the evidence, *NLRB v. KSM Industries, Inc.*, 682 F.3d 537, 543–44 (7th Cir. 2012). Rather, we determine only whether "there is evidence in the record supporting the Board's outcome that could satisfy a reasonable fact finder." *Id.* The presence of contrary evidence does not compel us to reverse the Board's order as long as there is also substantial evidence supporting it. *Teamsters "General" Local Union No. 200*, 723 F.3d at 783.

Because the Board has the principal responsibility for interpreting and enforcing the Act, we do not overturn the Board's conclusions of law so long as they have "a reasonable basis in law." *Roundy's Inc. v. NLRB*, 674 F.3d 638, 645 (7th Cir. 2012) (citation and internal quotation marks omitted); see also *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496 (1979); *NLRB v. Local Union No. 103, International Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 350 (1978). And we give particular deference to the Board's credibility determinations, which we will disturb only in extraordinary circumstances, such as obvious incredibility or clear bias. *Teamsters "General" Local Union No. 200*, 723 F.3d at 783; *Bloomington-Normal Seating Co. v. NLRB*, 357 F.3d 692, 695 (7th Cir. 2004).

Where the Board has adopted the administrative law judge's findings of fact and conclusions of law, we review the judge's determinations under the same standard we apply to a Board decision. *Teamsters "General" Local Union No. 200*, 723

F.3d at 783. Here, the Board summarily adopted most of the administrative law judge's findings of fact and conclusions of law, but with a few exceptions.

III. *Section 8(a)(1) Violations*

The administrative law judge found, and the Board affirmed, that the dealership and AutoNation in a number of instances acted unlawfully to frustrate their employees' protected rights to engage in concerted activity and to organize a union. The judge's findings are supported by substantial evidence and have a reasonable basis in law.

We analyze each unfair labor practice below. We start by reviewing the findings of coercive activity in violation of § 8(a)(1) in the run-up to the union election. We then review findings of several § 8(a)(1) violations after the election.

A.  *Surveillance, Interrogation of Employees, and Solicitation of Grievances in the Run-up to the Election*

Substantial evidence supports the administrative law judge's findings that the dealership violated § 8(a)(1) in the run-up to the election by coercively creating an impression of surveillance of union activity, interrogating employees about union activity, and soliciting and promising to remedy employee grievances. Employer conduct that "reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their protected rights" violates § 8(a)(1) of the Act. *NLRB v. Q-1 Motor Express, Inc.*, 25 F.3d 473, 477 (7th Cir. 1994) (citation and internal quotation marks omitted). Coercion need not be successful to be an unfair labor practice. *Id.*

1. *Creating an Impression of Surveillance*

A company commits an unfair labor practice if it creates the impression that employees' union activities are under management surveillance. *NLRB v. Gold Standard Enterprises, Inc.*, 679 F.2d 673, 676 (7th Cir. 1982) (company created an unlawful impression of surveillance when manager told an employee that he knew "all about" a union meeting and told another employee that he knew two employees had gone to the meeting). Under Board precedent, this occurs when an employee "reasonably could conclude" from the circumstances that surveillance was taking place. *Sam's Club*, 342 NLRB 620, 620 (2004). The administrative law judge found that in July and August 2008, Grobler created a coercive impression of surveillance when he commented on technician Juan Cazorla's attendance of union meetings.

Cazorla testified that in July 2008, Grobler asked why he was in such a rush to leave work and then answered his own question, suggesting that Cazorla had "that meeting" to go to. Cazorla pretended not to know what Grobler was talking about, although he was in fact rushing to get to a union meeting. Again in August 2008, Grobler commented to Cazorla that he had "better rush" since he had a meeting, although Cazorla was not going to a union meeting at that time. Employees opposed to the union, such as James Weiss, were unable to find out when and where union meetings were held. It would have been reasonable for Cazorla to infer from Grobler's comments that his union activities were under management surveillance. Substantial evidence supports the Board's finding that the dealership violated § 8(a)(1) by creating an impression of surveillance.

### 2. *Interrogation of Technician Puzon*

Substantial evidence also supports the administrative law judge's finding that, in October 2008, team leader Grobler coercively interrogated technician Larry Puzon about his union activity. Whether interrogation is coercive depends on the circumstances of the questioning, including "the tone, duration, and purpose of the questioning, whether it is repeated, how many workers are involved, the setting, the authority of the person asking the question, and whether the company otherwise had shown hostility to the union." *Multi-Ad Services, Inc. v. NLRB*, 255 F.3d 363, 372 (7th Cir. 2001). Other important factors are whether guarantees against reprisals accompany the questioning and "whether the interrogated worker feels constrained to lie or give noncommittal answers rather than answering truthfully." *Id.*

Here, Puzon testified that three or four times starting in October 2008, Grobler asked him one-on-one about his attendance at union meetings. All the interrogations occurred immediately after group meetings with AutoNation vice president Brian Davis, who led the company's opposition to the union. Puzon denied having attended union meetings, although he had, because he knew that Grobler was "for management." The judge credited Puzon's testimony about the incidents. Many factors thus support the judge's finding of coercive interrogation in violation of § 8(a)(1) of the Act: the timing of the questioning after management's union "education" meetings, the multiple unfair labor practices committed by the dealership in the run-up to the election, the lack of guarantees against reprisals for union support, and the fact that Puzon felt compelled to lie about his union support. We affirm the Board's finding on this violation.

3.  *General Manager Berryhill's Interrogations and Solicitation of Grievances*

Substantial evidence supports the Board's finding that the dealership violated § 8(a)(1) when general manager Berryhill coercively interrogated employees. Several technicians testified that on September 25, 2008, Berryhill called them individually into his office and asked them about union activity. The dealership's service director was also present. Berryhill admitted that the meetings happened. The setting of the meetings in Berryhill's office, Berryhill's and the director's positions of authority, and the fact that each technician was alone and outnumbered by managers all support the finding of coercion. See *Multi-Ad Services*, 255 F.3d at 372 (listing factors indicating coercion).

An employer's solicitation of grievances along with express or implied promises to adjust those grievances with the aim of frustrating employees' concerted activity also violates § 8(a)(1). *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 691 (7th Cir. 1982); see also *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 (1964) (holding that the Act "prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect."). An employer's aim to frustrate concerted activity can be inferred from the "context of the events" surrounding the employer's promise. *NLRB v. Gerig's Dump Trucking, Inc.*, 137 F.3d 936, 941 (7th Cir. 1998); see also *Simpson Electric Co. v. NLRB*, 654 F.2d 15, 17 (7th Cir. 1981) ("This rule is easier to state than apply, for an employer who means to influence an election will rarely say so, and his intent must be determined

by weighing the credibility of his denial against the attendant facts and circumstances he invites attention to.").

Substantial evidence supports the Board's finding that Berryhill unlawfully solicited employee grievances and promised at these meetings to remedy them. Multiple technicians testified that at the September 25 meetings, Berryhill asked the technicians how the dealership could improve. One testified that Berryhill responded that he was "working on" the problems and "in progress" on the solutions. It is true that, before the union campaign, Berryhill held monthly Technician Advisory Panel meetings, but there is no evidence that he had ever before sought out employee grievances through individual meetings in his office. The individual meetings also included inquiries about the union effort. Substantial evidence supports the finding that this was an effort to frustrate the union organizing drive by soliciting and at least implicitly promising to adjust grievances in violation of § 8(a)(1).

There was also substantial evidence that Berryhill adjusted grievances in violation of the Act when he demoted team leaders Grobler and Manbahal just one week before the union election. At his series of meetings with technicians on September 25, Berryhill heard complaints about Grobler. Later, at an unscheduled December 9 meeting with the technicians on the shop floor, Berryhill told the technicians he was going to fix some of the things they had complained about. He said that some complaints had already been addressed and that the dealership would try to continue making improvements in the future. Then Berryhill announced that he was replacing Grobler and Manbahal as team leaders. All this occurred just one week before the union election. These ex-

plicit promises to fix the employees' problems and the demotions just one week before the election support the Board's finding that the dealership violated § 8(a)(1) in this instance.

4. *Vice President Davis's Interrogation and Solicitation of Grievances*

Substantial evidence also supports the Board's finding that AutoNation vice president and assistant general counsel Davis coercively interrogated a technician in violation of § 8(a)(1). The technician, Tumeshwar Persaud, testified that in December 2008, Davis approached him and asked him how he felt about the union election. Persaud responded that he thought "we [the union] have a good chance." Davis smiled and walked away. It was not unreasonable for the administrative law judge to conclude that this question—coming one-on-one from the parent company's vice president in the final weeks before the election—was coercive. The question forced Persaud, who had not previously disclosed his union support, either to disclose his own union sympathies or to report on his perception of his fellow employees' union support. We affirm this finding.

Substantial evidence also supports the Board's finding that the dealership and AutoNation violated § 8(a)(1) when Davis solicited and implicitly promised to remedy employees' grievances at a meeting on October 15 or 16.[2] Technician Anthony Roberts testified that in mid-October, Davis held a

---

[2] The Board found it "unnecessary to pass" on whether Davis solicited and implicitly promised to remedy employee grievances because such a finding would have been cumulative and would not have affected the remedy.

meeting with employees at which he solicited employee complaints and, upon hearing that management had been unresponsive to employee complaints in the past, said that employees could call him or talk to him at any time. This meeting was part of a series of approximately ten meetings that management held in the run-up to the union election. Given this context, substantial evidence supports the Board's inference that Davis was implicitly promising to remedy grievances with the goal of frustrating the union effort in violation of § 8(a)(1).

B. *The Dealership's "Coaching" of Dean Catalano*

Substantial evidence and a reasonable basis in law support the Board's conclusion that the dealership violated § 8(a)(1) by issuing documented "coaching" to technician Dean Catalano after he voiced his displeasure with the presentation of a speaker from the Orange County Health Department in October 2009, ten months after the election. Here, the Board disagreed with the administrative law judge on a conclusion of law.

The Board and the administrative law judge agreed on the facts, and substantial evidence supports those findings. In September 2009, a shop steward, Catalano, saw another employee leave the restroom without washing his hands. Catalano discussed this with other employees, and they communicated their concerns to the dealership's sales manager. The manager arranged for a speaker from the county health department to visit the dealership. The speaker gave a presentation to employees focused largely on the flu virus. At the end of the presentation, after the speaker asked for questions, Catalano said that the presentation had not addressed his concerns about hand-washing and that it was not "the meeting

that we were looking to have." The speaker suggested that
Catalano raise his concerns with management, and he said
that he had and "this is what" he got. The dealership issued
Catalano a "coaching" document reminding him to be cour-
teous and respectful to everyone in the workplace.

The Board and the administrative law judge disagreed
about whether Catalano's comments were concerted activity
protected by the Act. The judge said no because Catalano's re-
marks were directed toward a guest of the dealership rather
than to management. The Board reversed: "It is irrelevant that
Catalano's comments were not directed to a management of-
ficial who was aware of employees' concern; what is relevant
is that his comments furthered employees' protected con-
certed activity addressing sanitary restroom habits, an em-
ployment term and condition."

The Board's interpretation of the Act was reasonable.
There is no logical reason or rule from case law that would
require concerted activity to be directed toward management
in order to be protected. Employees' concerted activity may
be protected even when it takes place "through channels out-
side the immediate employee-employer relationship." *Eastex,
Inc. v. NLRB*, 437 U.S. 556, 565 (1978) (distribution of a union
newsletter discussing right-to-work and minimum wage leg-
islation was protected concerted activity). Concerted activity
does not lose protection because it is unconnected to a specific
demand to management. See *NLRB v. Washington Aluminum
Co.*, 370 U.S. 9, 14 (1962) (Act protected employee walkout be-
cause it was too cold in their workplace, though employees
did not first make any demands to management).

Catalano's comments may have been perceived as perhaps
a little rude, but they were certainly not so rude that the Board

was unreasonable in finding they were protected. Particularly egregious conduct may lose the Act's protection. See, e.g., *American Steel Erectors, Inc.*, 339 NLRB 1315, 1317 (2003) (conduct was unprotected when a union member said that allowing iron workers to work for the company was "like throwing babies into the Merrimack River"); *Atlantic Steel Co.*, 245 NLRB 814, 816–17 (1979) (calling a foreman a "lying son of a b—" or a "motherf—ing liar" or saying that the foreman had told a "motherf—ing lie" was sufficiently egregious to lose the Act's protection). To decide whether an employee's statement to management was so egregious that it forfeited the Act's protection, the Board examines: "(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice." *Id.* at 816.

Catalano's conduct occurred during a meeting to address workplace hygiene issues. He waited until the speaker called for questions. His remarks did not disrupt the functioning of the workplace. Although perhaps arguably rude, his remarks did not include language unacceptable in the workplace, such as profanity or personal attacks. Even if Catalano's conduct was intemperate or confrontational, that would not mean he forfeited the Act's protection. See *Kiewit Power Constructors Co. v. NLRB*, 652 F.3d 22, 23, 28 (D.C. Cir. 2011) (holding that a worker telling a supervisor he had "better bring [his] boxing gloves" in a dispute over break time did not lose the Act's protection). The Board did not err by finding that Catalano's behavior was protected by the Act.

The Board also reasonably applied the law in concluding that the "coaching" document issued to Catalano would tend

to inhibit future concerted activity in violation of § 8(a)(1). Activity that chills protected concerted activity can violate the Act even if it falls short of a formal employment action. See *NLRB v. Air Contact Transport Inc.*, 403 F.3d 206, 213 (4th Cir. 2005) (noting that whether an employer action is labeled as "counseling" or "disciplinary" does not matter for § 8(a)(1) purposes as long as the action tends to coerce against engaging in protected activity); see also *Lancaster Fairfield Community Hospital*, 311 NLRB 401, 403 (1993) ("report" by employer asking employee to stop engaging in protected concerted activity violated § 8(a)(1) although it fell short of formal discipline). The Board could reasonably conclude that the coaching letter to Catalano chilled his protected activity in violation of § 8(a)(1) of the Act.

   C. *AutoNation's No-Solicitation Policy*

The Board also found that AutoNation, the dealership's parent company, violated § 8(a)(1) when it promulgated an overly broad no-solicitation policy in the employee handbook used at all of its facilities. Substantial evidence supports this finding. AutoNation's policy prohibited any solicitation on AutoNation property at any time. Whether or not AutoNation or the dealership enforced the policy, the Board was entitled to conclude that the policy's mere existence amounted to an unfair labor practice because of the likelihood it would chill protected concerted activity. See *Guardsmark, LLC v. NLRB*, 475 F.3d 369, 374, 377–78 (D.C. Cir. 2007) (maintaining overly broad no-solicitation policy was unfair labor practice even absent evidence that employer applied the policy to protected concerted activity); *NLRB v. General Thermodynamics, Inc.*, 670 F.2d 719, 721 (7th Cir. 1982) ("We have held that if an employer were to maintain an overbroad no-solicitation rule it would

violate Section 8(a)(1) of the Act even if there was no evidence that the rule was enforced.").

We also affirm the Board's remedy: ordering the posting of notices at all of AutoNation's facilities nationwide.[3] The Board's remedial order must be "tailored to the unfair labor practice it is intended to redress." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900 (1984). The Board's order meets that requirement. AutoNation committed an unfair labor practice at all of its facilities by issuing the no-solicitation rule in its employee handbook. Nationwide posting of a remedial notice is well-tailored to remedy the unfair labor practice. See *Guardsmark, LLC*, 475 F.3d at 381.

### D. *The Dealership's Assertion that It Would Not Recognize the Union Until There Was a Contract*

The administrative law judge found that the dealership violated § 8(a)(1) when general manager Berryhill told David Poppo, a shop steward for the union, that the dealership would not recognize the union until there was a contract in place. The dealership did not urge any exceptions to this finding before the Board. We thus summarily enforce the Board's order affirming the judge's finding of a § 8(a)(1) violation. See 29 U.S.C. § 160(e) (prohibiting courts of appeals from considering any objection not urged before Board absent extraordinary circumstances); *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1314 (7th Cir. 1991) (summarily enforcing Board determina-

---

[3] Here, the Board amended the administrative law judge's order to require notices at all AutoNation facilities rather than at just the Florida dealership at the center of this case.

tions regarding uncontested violations of the Act). This uncontested violation, while not in dispute in this appeal, remains relevant, "lending [its] aroma" to the rest of the facts of this case. *Id.* at 1315 (internal quotation marks omitted).

IV. *The § 8(a)(3) Violation by Firing Roberts*

Substantial evidence supports the administrative law judge's finding that the dealership's discharge of Anthony Roberts on December 8, 2008, a week before the election, was motivated by anti-union animus in violation of § 8(a)(3) of the Act. Section 8(a)(3) makes it an unfair labor practice to discriminate in hiring, "tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

The legal framework for showing that anti-union animus motivated a layoff is well established. Under *Wright Line*, 251 NLRB 1083 (1980), the Board's general counsel must show that anti-union animus was a "substantial or motivating factor" in the decision to lay off the employee. *Huck Store Fixture Co. v. NLRB*, 327 F.3d 528, 533 (7th Cir. 2003) (internal quotation marks omitted). This requires the general counsel to show "that the employees were engaged in union activities, that the employer knew of and harbored animus toward the union activities, and there was a causal connection between the animus and the implementation of the adverse employment action." *Id.* If the general counsel shows this, the employer may still escape an unfair labor practice finding by showing that it would have laid off the employee anyway, regardless of anti-union animus. *Id.* The Board may then conclude that the employer's explanation was a pretext because the stated reason did not exist or the employer did not actually rely on it. *Id.*

Here, the Board found that Berryhill's "identification of Roberts as a troublemaker and instigator of the organizational campaign" established that anti-union animus was a substantial factor motivating Roberts's layoff. The Board credited technician James Weiss's testimony that he had told Berryhill and vice president Davis that Roberts was a leader for the union. The Board also found that the dealership's stated reason for firing Roberts—that he lacked sufficient electronic diagnostic skills—failed to establish that Roberts would have been laid off in the absence of anti-union animus. The Board noted (1) that Roberts was more productive and had a higher skill rating than many technicians who were retained, and (2) that the record did not show that Roberts was ever counseled about his lack of electronic diagnostic skill before the layoff.

Substantial evidence supports the Board's finding that anti-union animus motivated Roberts's layoff. Weiss testified that on October 9, 2008, he told Berryhill that Roberts was a leading union supporter. The Board followed the judge in crediting that part of Weiss's testimony.[4] Berryhill himself admitted having talked often with Weiss about the union organizing drive. Weiss's testimony also supported the finding that Berryhill labeled Roberts a "troublemaker."

The judge and Board did not err by choosing to credit only part of Weiss's testimony while discounting the rest. *Guardian Industries Corp. v. NLRB*, 49 F.3d 317, 323 (7th Cir. 1995). The judge gave plausible reasons for believing Weiss's testimony

---

[4] The administrative law judge did find that, as of September 25, Roberts had not yet openly identified himself to management as a union supporter. This is not inconsistent with the idea that Berryhill knew about Roberts's union activity because Weiss had told him on October 9.

on Berryhill's knowledge of Roberts's union activity and his labeling Roberts a "troublemaker." The judge noted that Berryhill did not deny frequent talks with Weiss or that Weiss reported to him about union activity. We generally reverse an administrative law judge's credibility findings only in "extraordinary circumstances such as clear bias by the ALJ, utter disregard of uncontroverted sworn testimony, or acceptance of testimony that on its face is incredible." See *Bloomington-Normal Seating Co. v. NLRB*, 357 F.3d 692, 695 (7th Cir. 2004) (citation and internal quotation marks omitted). Extraordinary circumstances are not present here. Substantial evidence supports the judge's and the Board's finding that Roberts's discharge was motivated by anti-union animus.

Substantial evidence also supports the decision not to believe the dealership's claimed reason for laying off Roberts: that he lagged behind other technicians in electronic diagnostic skills. Although Roberts was notified in a 2007 performance review that he needed to "continue developing electrical diagnostic skills," that same evaluation rated his skill level as "on target." It is of course possible to read this evaluation as contrary to the findings or as supporting them. The dealership's shifting explanations for laying Roberts off—initially, Roberts was told the dealership was "just downsizing"—also provide evidence to support the decision not to believe the dealership's defense. The context of an impending union election and the other unfair labor practices also lend their aroma to Roberts's layoff. *NLRB v. Rain-Ware, Inc.*, 732 F.2d 1349, 1354 (7th Cir. 1984) (timing of layoffs can support inference that anti-union animus motivated the layoffs); *NLRB v. Tom Wood Pontiac, Inc.*, 447 F.2d 383, 386 (7th Cir. 1971) (other contemporaneous unfair labor practices are relevant in establishing discharge in violation of § 8(a)(3)).

The judge's comparison of Roberts's productivity and skill rating to other employees further supports the finding that Roberts would not have been laid off in the absence of anti-union animus. Roberts's hours and skill rating were higher than those of some other employees. A comparison between employees is a permissible way to support a finding that an employee was laid off due to anti-union animus. *Pacific Southwest Airlines*, 201 NLRB 647, 655 (1973) (noting that employee was senior to other employees as one reason for finding that discharge was motivated by anti-union animus). And the use of comparisons between workers to show pretext is not the same as a judge substituting his business judgment for the employer's—rather, it is one factor that went into the conclusion that the reason given by the company was a pretext.

The contrary evidence does not justify reversal under the substantial evidence standard. There was some testimony that Roberts did lag behind other technicians in his electrical knowledge, and Berryhill denied labeling Roberts a "troublemaker." But as explained above, there is also substantial evidence in the record supporting the Board's finding. We affirm the finding that the dealership violated § 8(a)(3) of the Act by firing Roberts due to anti-union animus.

V.  *The § 8(a)(5) Violations for Refusal to Bargain*

We also enforce the Board's order concerning the dealership's several bargaining violations. The administrative law judge, affirmed by the Board, reasonably applied the law in holding that the dealership violated § 8(a)(5) of the Act when it did not bargain over the spring 2009 layoffs of four employees, the suspension of technician skill level reviews, and the reduction in technician pay for pre-paid maintenance jobs, and when it refused to fulfill the union's information request.

The Board reasonably concluded that the dealership had a duty to bargain at the relevant times and that all of these actions were mandatory subjects for bargaining.

A. *The Dealership's Duty to Bargain*

The Board reasonably applied the law in holding that once the union was certified in 2010, the dealership's duty to bargain dated back to the December 2008 election. Under the "at-its-peril" doctrine, the dealership was liable for any bargaining violations that occurred between the election itself and the eventual resolution to election challenges that resulted in the union's victory. The fact that the union was not certified until 2010 does not nullify the dealership's duty to bargain during the interim period.

Under well-established Board precedent, "absent compelling economic considerations for doing so, an employer acts at its peril in making changes in terms and conditions of employment during the period that objections to an election are pending and the final determination has not yet been made." *Mike O'Connor Chevrolet*, 209 NLRB 701, 703 (1974), enforcement denied on other grounds, 512 F.2d 684 (8th Cir. 1975). If the union eventually wins the election, the employer is liable for any previous refusals to bargain. *Id.*

The at-its-peril doctrine is essential to effective enforcement of the Act: an employer may not "box the union in on future bargaining positions by implementing changes of policy and practice during the period when objections or determinative challenges to the election are pending." *Id.*; see also, e.g., *United Food & Commercial Workers v. NLRB*, 519 F.3d 490, 496 (D.C. Cir. 2008) (Board reasonably applied at-its-peril doctrine that "considers a union the elected representative of a

bargaining unit as of the date of its election, not the date of its certification"). We decline the petitioners' invitation to depart from this established law and to undermine effective enforcement of the Act while an employer's challenge to an election is pending.

The complex procedural history leading to certification of the union in this case does not defeat the doctrine's application. The dealership is correct that after *New Process Steel*, the Board voided its 2009 two-member decision affirming the bargaining unit determination and that the 2010 three-member Board order specified that the union was certified as of August 23, 2010. *Contemporary Cars, Inc.*, 355 NLRB 592, 592 & n.4 (2010). The employer's challenge to the election thus remained pending throughout this time period. But this delay in resolving the election challenge does not change the fact that the duty to bargain with the union related back to the December 2008 election.

The dealership also argues that it did not commit unfair labor practices by failing to bargain because contested ballots were erroneously opened pursuant to the later-voided 2009 two-member Board ruling. Board Rule 102.67(b) requires that election ballots "whose validity might be affected" by a Board decision be impounded and remain unopened pending the decision. It is not necessary to decide here whether it was improper to open the disputed ballots based on the Board's later-voided 2009 ruling. Whether the ballots were erroneously opened early should not affect the application of the at-its-peril doctrine, under which the duty to bargain dates back to the election if the union is eventually certified. The dealership does not argue that the possibly erroneous opening of ballots affected the validity of the union's certification. It also should

not affect the application of the at-its-peril doctrine after the union's victory.

The Board thus did not err by holding that the at-its-peril doctrine squarely applies to this situation. Absent compelling economic considerations, the dealership violated the Act by making unilateral changes on mandatory subjects of bargaining in the period between the election and the union's eventual certification.

B. *Compelling Economic Considerations?*

The Board reasonably applied the law in concluding that the dealership's situation in 2009 did not amount to compelling economic considerations sufficient to excuse its duty to bargain. The argument before the judge and the Board and the briefing in this petition for review focused on the presence of compelling economic considerations as related to the April 2009 layoffs. But no compelling economic considerations justified any of the dealership's unilateral moves on mandatory subjects of bargaining.

A compelling economic consideration is an "unforeseen occurrence, having a major economic effect … that requires the company to take immediate action." *Angelica Healthcare Services*, 284 NLRB 844, 853 (1987) (holding that loss of major customer was not a compelling economic consideration because it was not unforeseen).[5] A compelling economic consideration falls somewhere between a situation requiring the

---

[5] The dealership argues that *Angelica Healthcare Services* is not good law because the decision cited a case that was denied enforcement by the Sixth Circuit. But *Angelica Healthcare Services* cited that case only for the general and undisputed proposition that a company is not excused from

mere exercise of sound business judgment and an imminent business collapse. *Van Dorn Plastic Machinery Co.*, 286 NLRB 1233, 1245 (1987). A "sudden and unexpected loss of business" may be a compelling economic consideration. *Sundstrand Heat Transfer, Inc. v. NLRB*, 538 F.2d 1257, 1259 (7th Cir. 1976).

The policy of the Act requires employers to bargain on subjects that are "amenable to resolution through the bargaining process." *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 678 (1981). Thus, changes to employment driven by the need to reduce labor costs are mandatory subjects of bargaining. See *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 213–14 (1964) (management decision to outsource maintenance work to save money was mandatory subject of bargaining). But the decision to shut down all or part of an enterprise due to economic conditions unrelated to labor costs would not be a mandatory subject of bargaining. See *First National Maintenance Corp.*, 452 U.S. at 668–69, 687 (maintenance contractor's decision to end its contract to provide maintenance staff to a third-party business was not mandatory subject of bargaining where the decision to end the contract was due to the size of management fee paid to maintenance contractor and third-party business was responsible for all labor costs).

Applying these principles, compelling economic considerations require more than simply a large economic change for

----

bargaining by economic expediency and instead must show compelling economic considerations.

an employer. Instead, whether compelling economic consid-
erations are present must be guided by whether the employ-
ment decision at issue is amenable to resolution though bar-
gaining. See *Van Dorn Plastic Machinery Co. v. NLRB*, 736 F.2d
343, 349 (6th Cir. 1984) (Board should analyze whether bar-
gaining is required under *First National Maintenance* on re-
mand to determine if "compelling economic considerations"
were present). In many cases of economic stress, a union will
be in a position to agree to changes to blunt the effects of the
stress. The need to reduce labor costs is "peculiarly suitable
for resolution within the collective bargaining framework."
*Fibreboard Paper Products Corp.*, 379 U.S. at 214. If bargaining
might be effective as to the employment decision or its effects,
the Act requires an employer to bargain.

We recognize that in some cases a compelling economic
consideration may be so pressing that a decision is not "ame-
nable to resolution through the bargaining process," *First Na-
tional Maintenance Corp.*, 452 U.S. at 678, though it would seem
rare that management would not have time at least to consult
with union leaders. An employment action that is simply in-
evitable, no matter what a union might agree to, might also
qualify. If an economic change forces a business to change its
"scope and direction" to such an extent that it is "akin to the
decision whether to be in business at all," that could count as
a compelling economic consideration, assuming nothing the
union could agree to in bargaining could change the situation.
See *First National Maintenance*, 452 U.S. at 677.

Here, the Board could reasonably find that the dealership
did not face a situation inevitable or urgent enough to qualify
as a compelling economic consideration. We recognize that
the dealership faced a substantial drop in revenue and dire

financial circumstances as a result of the 2008 economic crisis. But the loss of business was neither sudden nor unexpected. The dealership knew well in advance of the actual dates of its unilateral actions that it was facing hard times. The dealership's controller testified that he discussed with general manager Berryhill as early as November or December of 2008 the need for layoffs in the service department. One team leader testified that he was told about impending layoffs in February or the beginning of March 2009. The layoffs did not occur until April, and the reduction in book hours for pre-paid service jobs did not happen until February 2009.

The fundamental point, though, is that despite the tough economy, there was sufficient time for the dealership at least to attempt to bargain about the layoffs and the other changes rather than acting unilaterally. The drop in business was severe, but any need for changes was apparent months in advance. There was nothing "sudden and unexpected" about the situation. See *Sundstrand Heat Transfer, Inc.*, 538 F.2d at 1259. The circumstances surrounding the dealership in late 2008 and early 2009 did not rise to the level of urgency that would have "require[d] the company to take immediate action" without taking the time to bargain. *Angelica Healthcare Services*, 284 NLRB at 853.

The dealership also argues that the Board made two legal errors. We disagree. First, the Board applied the correct legal standard. The Board did not erroneously apply an "economic exigency" standard rather than a compelling economic considerations standard. The judge had cited a case that used those terms interchangeably. See *United Steel Service, Inc.*, 351 NLRB 1361, 1369 (2007) (noting in the context of a post-certification refusal to bargain that "it is well settled that a drop in

business does not rise to the level of an economic exigency or compelling economic circumstances"). The two phrases arise from slightly different contexts—"compelling economic considerations" comes from pre-certification refusal-to-bargain cases and "economic exigency" comes from post-certification refusal-to-bargain cases. See, e.g., *Master Window Cleaning, Inc.*, 302 NLRB 373, 374 (1991) (post-certification); *Mike O'Connor Chevrolet*, 209 NLRB at 703 (pre-certification). We are aware of no indication that those two terms denote substantively different standards. See *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 755–56 (6th Cir. 2003) (citing pre-certification cases in discussing post-certification economic exigency); *United Steel Service, Inc.*, 351 NLRB at 1369 (using the two terms interchangeably).

Second, the dealership argues that the Board erred by treating unforeseeability as a necessary condition for compelling economic considerations. We do not read the decision that way. The judge and the Board treated unforeseeability as one of several factors, albeit an important one, that go into judging compelling economic considerations. The applicable case law agrees. See, e.g., *Sundstrand Heat Transfer, Inc.*, 538 F.2d at 1259 (holding that a "sudden and unexpected loss of business" may be a compelling economic consideration); *Angelica Healthcare Services*, 284 NLRB at 853 (stating that a compelling economic consideration is an "unforeseen occurrence, having a major economic effect ... that requires the company to take immediate action").

C. *The 2009 Layoffs and the Backpay Remedy*

There can be no doubt that the four April 2009 layoffs were a mandatory subject of bargaining. "Layoffs are not a man-

agement prerogative. They are a mandatory subject of collective bargaining." *NLRB v. Advertisers Mfg. Co.*, 823 F.2d 1086, 1090 (7th Cir. 1987). The dealership's duty to bargain over the layoffs also included a duty to bargain over the layoffs' effects, such as recall rights and severance benefits. *First National Maintenance Corp.*, 452 U.S. at 677, 681–82 (a business must bargain about the effects of a partial cessation of operations even if it does not have to bargain about the cessation itself). The dealership did not bargain over these subjects. Because the dealership had a duty to bargain between the election and the union's eventual certification, the Board reasonably applied the law in holding that the dealership violated § 8(a)(5) of the Act by not bargaining over the April 2009 layoffs.

The Board also did not abuse its discretion by ordering a backpay remedy. We review the choice of remedy for abuse of discretion and any factual basis for the remedy for substantial evidence. *NLRB v. Intersweet, Inc.*, 125 F.3d 1064, 1067 (7th Cir. 1997). Despite this deference, the function of a backpay remedy must be to restore the affected employees to the position they would have been in if their unlawful layoff had not happened. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900 (1984).

Substantial evidence supports the finding that the four laid-off employees might have retained their jobs had there been bargaining. The dealership paid technicians by the job, not by the hour. Thus, management discussed laying off technicians not as a cost-cutting measure but rather as a measure to make sure other employees had enough work to sustain them. It would not have been unreasonable for a union to have accepted reduced work for every technician rather than layoffs, or to have bargained for some other cost-cutting measures that would have saved the laid-off technicians' jobs.

Given these possibilities, it was reasonable to conclude that the four laid-off employees could have retained their jobs through bargaining. Despite some language that can be taken out of context, the judge did not conclude otherwise when he wrote that the employees "would have been discharged even in the absence of their union activities." The judge made that statement in the context of concluding the layoffs were not motivated by anti-union animus. It does not indicate a finding of fact that the employees would have been laid off anyway even if there had been bargaining. Substantial evidence supports the discretionary choice of the backpay remedy.

Our decision in *Sundstrand Heat Transfer* does not compel a contrary conclusion. In *Sundstrand*, we held that a backpay remedy for failure to bargain was inappropriate when the layoffs were "compelled by economic necessity." 538 F.2d at 1259–60. If economic necessity compels a layoff, the Board cannot reasonably conclude that bargaining could have saved the laid-off employee's job, and thus backpay would not be justified. Here, the circumstances were not so dire that bargaining between the employer and union could not have produced any other outcome. Options other than layoffs were available, so *Sundstrand* does not apply.

   D. *The Suspension of Skill Level Reviews, the Unilateral Reduction in Pay for Pre-Paid Maintenance, and the Information Request*

Substantial evidence supports the Board's findings that the dealership violated § 8(a)(5) of the Act when it suspended employee skill level reviews due to the union's election, reduced the amount paid to technicians for pre-paid maintenance jobs, and refused to respond to a union information request. The Board reasonably held that each was a mandatory

subject of bargaining and that the dealership violated that bargaining obligation.

The Board reasonably held, and substantial evidence supports, that the dealership violated its § 8(a)(5) bargaining obligation when it refused to bargain over its suspension of skill level reviews in the winter and spring of 2009. Although there is evidence that the timing of skill level reviews had been erratic in the past, a team leader admitted that he told employees that skill level reviews had been suspended in early 2009 to preserve the status quo pending union negotiations. There was a wage freeze at the time, but the wage freeze did not affect promotions and pay increases due to skill level reviews. Skill level reviews, as an evaluation and promotion tool, were certainly mandatory subjects of bargaining. See *Spurlino Materials, LLC v. NLRB*, 645 F.3d 870, 880 (7th Cir. 2011) (establishing new employee evaluation system was mandatory subject of bargaining). Thus the Board reasonably concluded that the dealership violated § 8(a)(5) by unilaterally suspending skill level reviews.

The Board also reasonably applied the law in finding that the dealership violated § 8(a)(5) when it reduced the amount it paid technicians for each pre-paid maintenance job without negotiating with the union. The dealership reduced the "book times" that determined the amounts workers were paid for each job, regardless of how long the work actually took. The dealership now suggests that this reduction actually resulted in the same pay for the same work, so this "technical correction" was not a change in wages and was not a mandatory subject for bargaining. While there is evidence in the record that the amount of work per job went down along with the amount paid, nothing in the record suggests that these twin

decreases were commensurate with each other and thus produced no net effect on wages. And, in fact, the number of hours per technician continued to go down during this period. This was, after all, a recession. The Board was fully entitled to view the reduction in pay per job as a unilateral pay cut in violation of the dealership's duty to bargain.

The Board also reasonably found that the dealership's failure to respond to the union's information request concerning job classifications, wage rates, and related items was a § 8(a)(5) bargaining violation. Substantial evidence indicates that the union requested this information in April 2009. An employer's duty to bargain includes a duty to provide the union with information "needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435–36 (1967). The dealership's refusal to provide the information violated § 8(a)(5) of the Act.

### *Conclusion*

Substantial evidence and a reasonable basis in law support the Board's order and the administrative law judge's order to the extent affirmed by the Board. We DENY the dealership and AutoNation's petition for review and ENFORCE the Board's order in its entirety.

MANION, *Circuit Judge*, concurring in part and dissenting in part. While joining most of the court's opinion, I write separately to address the four layoffs that were unrelated to animus and to highlight the need for back-pay mitigation.

When the dealership laid off Juan Cazorla, Larry Puzon, David Poppo, and Tumeshwar Persaud, it had a duty to bargain. Yet as we made clear in *Sundstrand Heat Transfer, Inc. v. N.L.R.B.*, 538 F.2d 1257, 1260 (7th Cir. 1976), "a full backpay remedy must have been predicated on the assumption that bargaining over the effects of the layoff would have kept the employees on the job." As the court notes, these four technicians were laid off to ensure that the remaining technicians had enough jobs to be adequately employed.[1] Technicians at this dealership were paid by the job, not by the hour, as is standard in the industry. To keep its skilled technicians from seeking better pay elsewhere, the dealership had to make sure they had enough work. This required distributing the dwindling workload among fewer technicians. The court speculates that the union could have bargained for less work per technician or some other unspecified deal. But in line with the company's business model, to keep jobs viable in that service center and to meet customer needs, the dealership had to keep its more skilled technicians as fully employed as possible. This is not conjecture: technicians were leaving the dealership for other opportunities, as they saw that the dealership could not supply enough work per person.

---

[1] Whether economic conditions were no longer "dire" is debatable. When there is not enough work to go around, some technicians will have to leave.

Further, the four technicians who were laid off did not even have the limited skill level that their ratings suggested. The administrative law judge credited the testimony of Alex Aviles, a team-leader technician who said that the four technicians' lower skill ratings did not even reflect their actual skill. Instead, Aviles testified that the ratings were "a thank you for your seniority," and the four did not "really have that skill set." Under *Sundstrand*, the dealership should not be penalized for attempting to keep as many of the highly skilled technicians as fully employed as possible. Yet now, the dealership is ordered to reinstate Cazorla, Puzon, Poppo, and Persaud—and they must be restored to seniority ratings that, on the undisputed record, they did not deserve based upon their actual skills. This is a punitive rather than a fair remedy, which should not be fully enforced.

In conclusion, I note the mitigation ordered by the Board provides that the four technicians discussed here, along with the unlawfully discharged Anthony Roberts, are to receive back pay and lost benefits, "less any interim net earnings." This would probably be a complicated formula that includes medical benefits, any unemployment benefits, part-time work, and possibly comparison with how layoffs were handled after bargaining began. The idea that these technicians would have received full pay if they were retained is dubious, particularly where this court recognizes that there was not enough work to go around when technicians were laid off. Requiring the dealership to pay seven years of back pay also seems too harsh, particularly when this litigation was extended by the Board's own quorum-related problems discussed in *N.L.R.B. v. Noel Canning*, 134 S. Ct. 2550 (2014). The dealership should not be penalized for significant delays that

it did not create. At the least, however, mitigation for the ordered back-pay remedies will require careful calculation.