# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-1586

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

*v.*

TEAMSTERS "GENERAL" LOCAL UNION NO. 200,
an affiliate of the International
Brotherhood of Teamsters,

*Respondent.*

Petition for Review of an Order of the
National Labor Relations Board.
No. 30-CB-5303.

ARGUED SEPTEMBER 5, 2012—DECIDED JULY 23, 2013

Before BAUER, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* After losing a contentious union election, Timothy Buban went to work as a shuttle bus driver at a construction site. A year later, Buban faced more bad news: His employer laid him off from this position. When Buban approached the current union leadership—his former political rivals—for help in returning to work, his troubles continued. Specifically, the

National Labor Relations Board determined that the union, as the exclusive source of referrals for their members to the construction company, did not consistently use objective criteria in determining which job-seekers to refer to the company; discriminatorily failed to refer Buban for employment; and failed to provide him with specifically requested information concerning the union's job-referral procedures. All three determinations constitute violations of the National Labor Relations Act. The union appeals the Board's decision. We affirm.

**I.**

Buban is a member of Teamsters General Local Union No. 200 in Wisconsin. He participates in union politics as a member of the dissident group "Teamsters for a Democratic Union," and served as secretary-treasurer of Local 200 from 2004 to 2006. Buban lost his bid for reelection in 2006, following an acrimonious campaign against the rival "Teamsters 4 Teamsters" slate of candidates. He resigned his position in October 2006, shortly after his electoral defeat but before his term was to expire.

At the time of his resignation—but presumably before he had completely relinquished power—Buban, in his capacity as a union official, referred himself for work at the Bechtel Construction Company's Elm Road Power Generating Station Project in Oak Creek, Wisconsin. Bechtel hired him as a shuttle bus driver, transporting workers to and from the construction site. Bechtel laid Buban off—along with all other drivers who lacked a certain license—in September 2007.

That month, Buban filed a grievance with Local 200 regarding the layoff. Union business agent Mike Gurich was assigned to handle Buban's grievance. Gurich and Buban had been rivals during the previous union local election campaign—Gurich was affiliated with the "Teamsters 4 Teamsters" group, and was appointed to his position as union business agent following that group's electoral victory. Buban and Gurich clashed throughout the grievance process, with Buban alleging that the union was responsible for the loss of his job and had improperly handled his grievance. In an October 2007 letter to Burich detailing the steps that the union had taken to resolve Buban's grievance, Gurich called Buban's allegations "somewhat hysterical."

Buban claims that, from at least as early as January until April 2008, he repeatedly told Gurich that he wished to return to work as a bus driver, truck driver, or warehouse worker at the Elm Road site. Although Local 200 disputes the particular jobs for which Buban expressed an interest, the union does not deny that Buban informed Gurich of his interest in returning to work at the Elm Road site. Regardless, Buban's conversations with Gurich were for naught; he remained unemployed throughout this period.

In April 2008, Carol Simon, a fellow union member and political ally of Buban's, informed Buban that Gurich had told her that Buban "hasn't put his name on the out-of-work list." The existence of such a list was news to Buban. In all his conversations with Gurich regarding his desire to return to work, Gurich had never mentioned it.

But once Simon alerted him to the existence of the list, Buban called Gurich to expressly request to be placed on it. Gurich complied with his request, placing Buban's name and telephone number on the list. Gurich also placed a question mark next to Buban's name—a designation that appears alongside only nine other names on the list. According to Gurich, this was the first time that Buban had asked to be placed on the list since he was laid off in September 2007.

After Buban had been placed on the referral list, Gurich referred several other union members for positions at the Elm Road project. The parties in the case disagree on whether these individuals were referred ahead of Buban. According to Local 200, Gurich referred these individuals to Bechtel based on objective criteria; the Board, however, sees these referrals as arbitrary at best, and favoritism based on loyalty to union leaders at worst.

By August, a still-unemployed Buban visited Local 200's office to request information about the workings of the referral system. Buban met with another union business representative, who said that he was unable to help Buban and that the relevant union officials were not available. The business representative agreed to take a message though—but no one from the union office ever followed-up with Buban regarding his visit.

By this point, Buban had filed charges against the union with the National Labor Relations Board. In May 15, 2009, the Regional Director for Region 30 of the Board issued a complaint against the union, alleging violations of Section 8(b) of the National Labor Relations Act

("NLRA"), 29 U.S.C. § 158(b). The next year, an administrative law judge ("ALJ") issued a decision finding that the union: violated § 8(b)(1)(A) of the NLRA by operating an exclusive hiring-hall without consistently applying objective criteria; violated §§ 8(b)(1)(A) & 8(b)(2) by discriminatorily failing and refusing to refer Buban for employment at the Elm Road site; and § 8(b)(1)(A) by failing and refusing to provide him with pertinent information, including the union's job referral list and the procedures that the union used to select applicants from this list for referrals. The Board affirmed these specific findings, and ordered the union to (i) compensate Buban for his lost earnings stemming from the union's discriminatory treatment of him; (ii) refer Buban to Bechtel for employment; (iii) operate its referral system using objective, consistently applied criteria; and (iv) provide Buban with information regarding these criteria.

The union appeals.

To understand the issues in this case, some discussion of the referral list is necessary. This document has its origins in the Area Agreement between Local 200 and Bechtel governing labor relations at the Elm Road site. This agreement provides for a procedure by which the union participates in Bechtel's hiring decisions. After Bechtel places a request for additional workers with Local 200, the union has the exclusive right to refer union members for employment for a 48-hour period. Although the union enjoys an exclusive right of referral during this 48-hour window, Bechtel is not required to hire those job-seekers that the union refers. If Local 200

does not make the requested number of referrals during the 48-hour period, Bechtel may look elsewhere for workers. In practice, however, Local 200 responded to every request for workers that Bechtel made within 48 hours, and Bechtel only hired those workers that the union referred.

To determine which union members to refer for employment, Gurich maintained a document with the names and other descriptive information for union members seeking work. Each entry in the document contains the name and contact information for each union member seeking a referral. Some entries also include an assessment of the individual's qualifications, written by Gurich. Gurich claims to have added job-seekers to the list in chronological order. Although the first portion of the list is indeed numbered, Gurich also placed sticky notes throughout the list with the names of other job-seekers; these notes were unnumbered. A small number of entries also include additional comments, such as "seems like [a] good guy," "friend of Rick Badnik," and "good driver." Some sections of this document were organized as an ordered list, while others were not. (For simplicity, we refer to the entire document as a list because that is the term used by the parties. The document actually appears to be more of a loose conglomeration.)

Gurich claims to have considered the following factors in determining which individuals to refer for positions at Elm Road: order in which the individual requested placement on the list, layoff status, seniority, experience,

foreman requests, and work history. Gurich did not apply these factors in any set formula; he acknowledges that his referral system was not an "exact science." While there were no formal rules regarding Gurich's methods, Gurich stated that his system was governed by unwritten rules, including a degree of discretion. These unwritten rules remain a mystery to us, however; in one particularly perplexing instance, Gurich referred a union member who could not recall having taken any steps to place his name on the list.

The record is unclear as to how those union members whose names appear on the list first learned of the existence of this document. Relatedly, no information was presented about the proportion of the union member-ship that was aware of the list's existence. According to the union, members could request to be placed on the list either in-person at the Local 200 office or telephoni-cally. But since there is no evidence that Gurich or other union officials took steps to inform members on how to be placed on the list, or even to publicize its existence, the union failed to explain exactly how this process worked in practice.

## II.

Local 200 challenges three aspects of the Board's order. First, the union disputes the Board's finding that the union operated an exclusive hiring-hall without objec-tive, consistently applied criteria to refer job-seekers. Second, the union argues that, even if it did operate an exclusive hiring-hall, substantial evidence does not exist

to support the Board's determination that the union discriminated against Buban by failing to refer him for work. Third, the union claims that, even if it did operate an exclusive hiring-hall, substantial evidence does not exist to support the Board's finding that the union violated the NLRA by failing to provide Buban with information concerning the union's job referral practices.

In reviewing a National Labor Relations Board order, we review the Board's legal determinations for a reasonable basis. *Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 502 (7th Cir. 2003). The Board's legal conclusions "must be upheld unless they are irrational or inconsistent with the [NLRA]." *ATC Vancom of Cal., L.P. v. NLRB*, 370 F.3d 692, 695 (7th Cir. 2004) (citation and quotation omitted).

We review the Board's factual findings under a "substantial evidence" standard. *Sears*, 349 F.3d at 502. Factual findings must be supported by "such relevant evidence that a reasonable mind might accept as adequate to support the conclusions of the Board." *L.S.F. Transp., Inc. v. NLRB*, 282 F.3d 972, 980 (7th Cir. 2002). In making this determination, "[t]he presence of contradictory evidence is not of consequence as long as substantial evidence supports the Board's decision." *Id.* The Board's determinations of witness credibility are subject to a particularly deferential standard; they are contravened only "in extraordinary circumstances." *FedEx Freight E., Inc. v. NLRB*, 431 F.3d 1019, 1026 (7th Cir. 2005).

Where, as here, the Board adopts an ALJ's findings of fact and conclusions of law, the court will review the judge's determinations under the same standard. *Sears*, 349 F.3d at 508.

A.

A union breaches its duty of fair representation under the NLRA when it acts toward its members in a manner that is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). This duty applies to all union activity, *Air Line Pilots Ass'n, Int'l. v. O'Neill*, 499 U.S. 65, 67 (1991), including the operation of an exclusive hiring-hall. In this case, the union challenges the Board's determination that the union breached its statutory duty by operating an exclusive hiring-hall without using consistently applied, objective criteria. There are two components of the Board's assessment. First, the Board determined that the union operated an exclusive hiring-hall. Second, the Board determined that the union did not operate the hall using consistent, objective criteria. Since both components are necessary to the conclusion that the union challenges, we address each element in turn.

We first assess whether substantial evidence supports the Board's determination that the union operated an exclusive hiring-hall. This determination is crucial to addressing the second-stage question of whether the union violated the NLRA by operating its exclusive hiring-hall in an inconsistent, non-objective manner. *See NLRB v. Int'l Bhd. of Elec. Workers, Local Union 16*, 425 F.3d 1035, 1040 (7th Cir. 2005) ("A union is presumed to have breached its duty of fair representation if, in the administration of a hiring-hall agreement, it refuses to refer a member who is eligible under that agreement.").

To determine whether an exclusive hiring-hall exists, the Board examines the "totality of the circumstances." *NLRB v. Laborers Local 334*, 481 F.3d 875, 881 (6th Cir. 2007); *Teamsters Local Union No. 174 (Totem Beverages, Inc.)*, 226 N.L.R.B. 690, 690 (1976). These circumstances may include any contractual language between the union and the employer, as well as the actual hiring practices that these parties follow. *See Laborers Local 334 (Kvaerner Songer, Inc.)*, 335 N.L.R.B. 597, 599-600 (2001).

We begin our analysis by examining the Area Agreement between the union and Bechtel.[1] On the surface, the language in this agreement may appear to support the union's position. Specifically, the Agreement allows Bechtel to look to any source for employees after the

---

[1] Local 200 refers us to a separate Area Agreement, between the Teamsters and Wisconsin Power Constructors, which covered the latter entity's construction of a power plant in Port Washington, Wisconsin. Local 200 notes that an NLRB adjudicator in the Board's Milwaukee Regional Office (Region 30) determined that this Area Agreement—which contains very similar language as the Agreement in the instant case—did not establish an exclusive hiring-hall. But a NLRB Region 30 decision concerning a separate matter does not have precedential weight in our court. (Local 200 also claims that this Area Agreement involves the "same [p]roject" as the Agreement in the instant case. Given the location of the two sites on opposite sides of the Milwaukee metropolitan area and the fact that they involved different employers, this claim, without more, seems implausible.)

union's 48-hour exclusive referral period. The union argues that the temporary nature of this exclusive referral period indicates that the Agreement was non-exclusive.

The fact that the union's sole right to refer employees is temporary does not mean that it is non-exclusive, however. Rather, the 48-hour window simply requires that the union exercise its exclusive right within a given time frame. "Hiring is deemed to be 'exclusive' . . . if the union retains sole authority to supply workers . . . for some specified period of time, such as 24 or 48 hours." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 73 n.1 (1989). Thus, the fact that the union's referral rights were time-limited will not save the union from a finding that it operated an exclusive hiring-hall.

Next, we turn to the parties' hiring practices. Where there is an implicit understanding between a union and an employer regarding hiring practices, the Board infers that a de facto exclusive hiring-hall exists. *Elec. Workers Local 2115 (Nat'l Elec. Contractors Ass'n)*, 136 N.L.R.B. 1618, 1619 (1962). Here, Bechtel only hired those job-seekers that the union recommended. Whenever job-seekers would show up at the Elm Road site without the union's seal of approval, Bechtel would direct them to the Local 200 office for placement on the referral list. Moreover, when Bechtel declined to hire job-seekers that were referred by the union, the union's practice was to file a grievance. As significantly, the testimony of two union officials before the ALJ in this case led the judge to concluded that Local 200 believed that it held the

exclusive right to refer workers to Bechtel. These practices of both the union and Bechtel, when viewed in tandem with the language of the Area Agreement, provide substantial evidence to support the Board's finding that the union operated an exclusive hiring-hall.

A union is subject to the duty of fair representation in its operation of a hiring-hall, and must exercise its hiring authority "in a nonarbitrary and nondiscriminatory fashion." *Breininger*, 493 U.S. at 88; *see also Boilermakers Local No. 374 v. NLRB*, 852 F.2d 1353, 1358 (D.C. Cir. 1988) (A union's operation of an exclusive hiring-hall creates "a fiduciary duty on the part of the union not to conduct itself in an arbitrary, invidious, or discriminatory manner when representing those who seek to be referred out for employment. . . . [A]ny departure from established exclusive hiring hall procedures which results in a denial of employment . . . breaches the duty of fair representation . . . and violates Section 8(b)(1)(A) and (2) of the [National Labor Relations] Act." (quoting *Teamsters Local 519 (Rust Eng'g Co.)*, 276 N.L.R.B. 898, 908 (1985))). The Board considers a union to have violated its duty of fair representation "if it administers an exclusive hiring hall arbitrarily or without reference to objective criteria." *Stagehands Referral Serv., LLC*, 347 N.L.R.B. 1167, 1170 (2006). In other words, in the Board's, view an exclusive hiring-hall must utilize job-referral criteria that are both objective and consistently applied.[2]

---

[2] Without adopting or rejecting this requirement as the legal standard in our circuit, we note that the Board employed this

(continued...)

Here, the ALJ determined that, although union officials can point to objective criteria—e.g., seniority, work experience, etc.—to explain their job referral decisions, Local 200 did not apply these criteria consistently. Instead, the union relied on what the ALJ deemed "clearly subjective" factors in some instances. For example, Gurich referred a union member for employment even though that individual had not requested to be placed on the list; allowed another individual whom Gurich believed did not get "a fair shake" to bypass other, more senior union members on the list; and wrote notes on the list, such as "friend of Rick Badnik" and "seems like good guy." This evidence supports the notion that subjective factors may have come into play. Based on these facts, the ALJ stated that Gurich considered the referral list "as an informal referral system that relied in part on his discretion." The Board concurred with the ALJ's assessment, finding that the union did not consistently apply objective criteria in referring applicants to Bechtel.

Between Gurich's testimony and the haphazardly compiled referral list that appears in the record, there

---

[2] (...continued)

standard in this case and many other decisions; that the parties here agree that this standard ought to apply; and that several of our sister circuits have favorably cited this standard. *See Lucas v. NLRB*, 333 F.3d 927, 934 (9th Cir. 2003); *Jacoby v. NLRB*, 325 F.3d 301, 309 (D.C. Cir. 2003); *NLRB v. Iron Workers Local 46*, 149 F.3d 93, 107 (2d Cir. 1998)

is substantial evidence to support the factual finding that Local 200 did not consistently rely on objective criteria, and the Board's legal conclusion that the shifting, amorphous factors that the union employed constitute a breach of the duty under the NLRA has a reasonable basis. *See Breininger*, 493 U.S. at 88 (Unions must exercise their authority "in a nonarbitrary and nondiscriminatory fashion."); *Jacoby v. NLRB*, 325 F.3d 301, 309 (D.C. Cir. 2003) (stating that unions have a duty to use "'objective criteria' and 'consistent standards'" in the operation of hiring-halls). Accordingly, we affirm the Board's holding that the union operated an exclusive hiring-hall without consistently using objective criteria, in violation of Section 8(b)(1)(A) of the NLRA.

## B.

Local 200 also takes issue with the Board's conclusion that it discriminatorily failed and refused to refer Buban for employment. This holding, if affirmed, constitutes an additional violation of the NLRA. *See Breininger*, 493 U.S. at 88 (stating that when a union operates an exclusive hiring-hall, it must do so in a nondiscriminatory manner).

In this case, the Board adopted the ALJ's findings that the union failed to refer Buban for employment based on Buban's years-long political opposition to the current union leadership. On appeal, the union claims that the ALJ "did not support his findings with factual references, and even if [Local 200] did Buban no favors, such is far from constituting evidence of discrimination."

Local 200 argues that its failure to refer Buban could be due to negligence or mistake, rather than animus, and that the ALJ's decision that the union's actions were discriminatory is grounded in little more than a hunch.

As an initial matter, we note that Local 200 misstates the legal standard for discrimination. Local 200 claims that evidence of "intentional, prima facie discrimination" is needed, citing *NLRB v. Operating Eng'rs Local 139*, 796 F.2d 985, 993 (7th Cir. 1986) ("[I]ntentional union misconduct [is required] to show a breach of the duty of fair representation."). Following the publication of *Local 139*, however, "the Supreme Court in *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65 (1991) rejected [our] court's narrow reading of the duty of fair representation standard." *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992); *see also id.* at 1302 n.7 (explaining that the *Air Line Pilots* Court rejected the Seventh Circuit's prior position that employees "do not need . . . protection against representation that is inept but not invidious" (internal quotation omitted)).

To determine whether a union's conduct should be classified as arbitrary, discriminatory, or in bad faith, the Board applies the *Wright Line* analysis. *Wright Line, A Div. of Wright Line, Inc.*, 251 N.L.R.B. 1083, 1087 (1980). This framework is particularly appropriate where, as here, two differing rationales, one permissible (here, negligence) and the other impermissible (i.e., a discriminatory motive), could be claimed to have caused the outcome. The Supreme Court and our circuit have endorsed the application of the *Wright Line* framework in these cir-

cumstances. *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 403-04 (1983), *abrogated on other grounds by Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267 (1994); *NLRB v. GATX Logistics, Inc.*, 160 F.3d 353, 356 (7th Cir. 1998).

Under the first step of the *Wright Line* framework, the General Counsel of the Board must show that the employee or union member's political activity was a "motivating factor" in the employer or union's adverse action against that individual. *Wright Line*, 251 N.L.R.B. at 1087. In *NLRB v. So-White Freight Lines, Inc.*, we affirmed a Board finding that the first prong of *Wright Line* was satisfied based on similar evidence as in the instant case. 969 F.2d 401, 407 (7th Cir. 1992). In *So-White*, the Board concluded that an employee was dismissed from his job in retaliation for his union organizing. The Board made this determination based on the facts that (i) the employer had knowledge of the employee's pro-union activities, and (ii) a supervisor stated that the employee was "a pain, causing trouble with the union." *Id.* Buban's case involves analogous evidence. In the instant case, the ALJ found that (i) the union was aware of Buban's political opposition to the union's current leadership, and (ii) union officials made derogatory statements against Buban throughout the most recent union election. These two findings are strongly similar to the factual findings that undergirded the conclusion in *So-White* that the employee's political activities were a factor in motivating his employer's adverse actions. Moreover, the ALJ in the instant case made a third factual finding: that Buban and Gurich clashed during the grievance pro-

cess. We affirmed the Board's conclusion that the first *Wright Line* step was satisfied in *So-White*—a case with only two out of the three relevant facts that are present in the instant case. Accordingly, we think that the *So-White* precedent provides a sufficient basis for the Board's legal conclusion concerning the first *Wright Line* step in the instant case.

The union argues that, in finding under the first *Wright Line* step that Buban's political activity was a motivating factor in the union's failure to refer him to work, the ALJ relied on his own "inference and suspicion." We think that this criticism is misguided. Unless a union official were to admit directly that he or she acted with discriminatory intent, some degree of inference almost always will be necessary to make assessments concerning an individual's motives. *Cf. Wright Line*, 251 N.L.R.B. at 1083 ("[A]n employer will rarely, if ever, baldly assert that it has disciplined an employee because it detests unions."). Therefore, it is permissible to rely on circumstantial evidence to determine whether a union's disapproval of a member's intra-union political conduct was a motivating factor of the union's adverse action. *See NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 626 (7th Cir. 1981) ("[I]n making this determination [of motivation] the Board is free to rely on circumstantial as well as direct evidence."). Our deferential review of the Board's determinations of witness credibility, "which we will disturb only in extraordinary circumstances," *FedEx*, 431 F.3d at 1026, reflects the importance we place on what Local 200 refers to as "inference and suspicion."

Local 200 also argues against the finding that antipathy towards Buban was a motivating factor in its treatment of him by noting that it "placed Buban on the job referral list on the same day he asked that his name be added." According to the union, this fact indicates that the union's failure to add him to the list earlier should be attributed to negligence, not animus. But the issue of when Gurich should have known that Buban wanted to return to any position at the Elm Road site—even without Buban specifically inquiring about a job-referral list—is in dispute. Essentially, it's Buban's word against Gurich's. With the ALJ finding other aspects of Gurich's testimony "not credible," it seems reasonable for the ALJ and the Board not to regard as dispositive Gurich's claim that he placed Buban's name on the list as soon as he knew (or should have known) that Buban desired to be added to it.

Since the first step of the *Wright Line* framework has been satisfied, we turn our attention to the second step. Under this second step, the burden shifts to Local 200 to show that the same outcome would have occurred "even in the absence of the protected conduct." *Wright Line,* 251 N.L.R.B. at 1087. Given the haphazard process by which Gurich referred job-seekers, it is unsurprising that the union does not seriously attempt to make this showing.

The union does, however, call our attention to the following statement from the ALJ's decision: "Gurich did not consistently apply his proffered criteria for referrals, so this result [Buban being passed-over for job

referral] probably was unavoidable but, nonetheless, was discriminatory in effect, especially to Buban and others like him." We agree with Local 200 that this statement raises questions. If the ALJ means to say that Buban would not have received a job referral regardless of whether the union discriminated against him, then this statement casts doubt on whether the requirements of the second *Wright Line* step were met. There is, however, an alternative interpretation of the ALJ's statement. This interpretation suggests that (i) in the absence of animus, Gurich's haphazard referral process *probably*—but not definitely—would have been sufficient to cause Buban to be passed-over for employment, and (ii) Gurich's animus towards Buban also was sufficient to cause Buban to be passed-over. This interpretation would be entirely consistent with a finding that the union's animus towards Buban at least could have been dispositive. In any case, the second prong of *Wright Line* places the burden on Local 200 to show that this same outcome would have occurred, absent the union leadership's clashes with Buban. The union has made no such showing. Nor could it, given the union's inconsistent application of any job-referral criteria that it may have considered, as well as its inability to explain how it determined which job-seekers from the list to refer to Bechtel.

Based on our *Wright Line* analysis, we hold that the Board's conclusion that Local violated the NLRA by discriminatorily failing and refusing to refer Buban for employment has a reasonable basis in law.

C.

Finally, the union disputes the Board's conclusion that it failed to provide Buban with pertinent information concerning the job-referral list, including any written rules, any notices posted in the halls, and a physical copy of the list itself. The statutory duty of fair representation requires unions to "deal fairly with an employee's request for information as to his relative position on the out-of-work register." *Operating Eng'rs Local 139*, 796 F.2d at 993. Thus, a failure to provide a union member with this information violates the NLRA.

Local 200 acknowledges that it did not provide Buban with his requested information, but claims that this failure does not violate the NLRA. Local 200 offers two arguments in support of this claim. First, the union claims that the information that it provided to Buban is sufficient to meet its statutory duty. While it is true that Local 200 provided Buban, along with all other job-seekers, with some information on its job referral procedures, it did not provide him with his specifically requested information, including a copy of the referral list. According to the Board, a union's failure to produce a referral list, when requested by a union member, violates Section 8(b)(1)(A) of the NLRA. *Int'l Ass'n of Iron Workers Local Union 27 (Morrison-Knudson)*, 313 N.L.R.B. 215 (1993); *see also Operating Eng'rs Local Union No. 3*, 324 N.L.R.B. 14 (1997) (holding that Section 8(b)(1)(A) requires unions to provide requested information that is "reasonably directed toward ascertaining whether the [union] member has been fairly treated with respect

to obtaining job referrals"). We think that the Board's interpretation of Section 8(b)(1)(A) to require the provision of this specific information upon request has a reasonable basis. Moreover, the Board's past administrative decisions in this area—*see, e.g.*, *id.*; *Iron Workers, Local 27*, 313 N.L.R.B. at 215—should have put Local 200 on notice of its obligations. Therefore, the union's argument that it is not required to provide Buban with the specific information that he requested because it already provided union members with other information concerning the referral process is unpersuasive.

Second, Local 200 argues in the alternative that if the information that it provided to Buban was in fact inadequate, then this stems from a good-faith belief that the union did not operate an exclusive hiring-hall (and therefore had no obligation to provide Buban with information concerning hiring-hall practices), and that it did not have a discriminatory intent in not providing Buban with his requested information. Local 200 does not cite any caselaw or Board decisions to support its contention that a good-faith, but mistaken, belief of this magnitude can serve as a defense to this violation. Instead, Local 200 calls our attention to *Steamfitters Local Union No. 342*, 336 N.L.R.B. 549 (2001). That case addresses a clerical error regarding the treatment of specific job-seekers at an exclusive hiring-hall. *Id.* at 553. We think that a union's claimed good-faith error regarding whether it was operating an exclusive hiring-hall is a "mistake" of a much greater magnitude than simple negligence in the treatment of a particular job-seeker.

Concerning Local 200's argument that there is "no evidence that [it] had a discriminatory intent to forbid criteria dissemination," the union once again misstates the intent requirement needed to find a breach of the duty of fair representation. We refer back to our *White Line* analysis evaluating whether the union's failure to refer Buban for employment can be classified as arbitrary, discriminatory, or in bad faith; the same basic analysis also supports the Board's finding that the union's failure to provide Buban with his requested information.

We also note that whether the union's failure to respond to Buban's information request is attributable to an improper motive is a question best answered by the ALJ, who is well-situated to determine witness credibility. *NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 819 (7th Cir.1991). Here, the ALJ deemed Gurich's claim that Buban had never asked him or, to his knowledge, any other union official for information concerning the referral-list to be not "very convincing" and "not credible." Thus, we affirm the Board's holding that Local 200 violated the NLRA by failing to provide Buban with the information concerning the union's job-referral process that Buban requested.

**III.**

Substantial evidence exists to support the Board's findings that the union operated an exclusive hiring-hall without applying consistent, objective factors; discriminatorily failed and refused to refer Buban for employment; and discriminatorily failed and refused to

provide Buban with job referral information to which he was legally entitled. The Board's conclusions that each of these actions violates the National Labor Relations Act are reasonable. Accordingly, we AFFIRM the Board's Decision and Order.