# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3686

_____

International Alliance of Theatrical Stage Employees, Moving Picture
Technicians, Artists and Allied Crafts of the United States, its Territories and
Canada, Local Union No. 151

*Petitioner*

Katie Martens

v.

National Labor Relations Board

*Respondent*

_____

No. 16-3940

_____

National Labor Relations Board

*Petitioner*

v.

International Alliance of Theatrical Stage Employees, Moving Picture
Technicians, Artists and Allied Crafts of the United States, its Territories and
Canada, Local Union No. 151

*Respondent*

Katie M. Martens

_____

Submitted: October 18, 2017
Filed: March 26, 2018
_____

Before SMITH, Chief Judge, GRUENDER and BENTON, Circuit Judges.
_____

SMITH, Chief Judge.

The International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada, Local No. 151 (IATSE) petitions for review of the National Labor Relations Board ("Board") decision finding IATSE violated the National Labor Relations Act (NLRA) through its hiring practices. The Board cross-applies for enforcement of the decision and order. We deny the petition for review and grant the cross-application for enforcement.

## I. *Background*

IATSE furnishes labor for entertainment-venue employers, supplying stagehands, riggers, and lighting technicians to employers who require such services for entertainment events. Two such employers are The Freeman Companies, d/b/a Freeman Decorating Services, Inc. ("Freeman") and SMG, specifically SMG's place of business called the Pershing Center in Lincoln, Nebraska ("SMG Pershing"). The Board issued a complaint alleging IATSE had operated an exclusive hiring hall with respect to Freeman and SMG Pershing and had violated section 8(b)(1)(A) and (2) of the NLRA. The Board alleged that IATSE: (1) discriminated against nonunion employees by granting priority to its own members for job referrals; (2) refused to

refer two employees to a particular job in February 2013; (3) suspended seven members from its referral list; (4) had maintained a rule in its constitution and bylaws prohibiting legal proceedings against it by its members without providing for the four-month limitation required by section 101(a)(4) of the Labor Management Reporting and Disclosure Act; (5) followed a job-referral rule that allowed IATSE to refuse to refer an employee in order to collect a fine; (6) failed to remit certain bonuses to employees who are not IATSE members; and (7) failed to remit such bonuses to certain individuals for improper reasons. IATSE denied all allegations.

After a trial in early 2014, the administrative law judge (ALJ) found all the allegations to be supported by the evidence, except the fourth: that IATSE violated the NLRA by failing to include certain language in its constitution and bylaws. The Board affirmed the ALJ's rulings and findings, adopting her opinion with limited modifications, in fall 2016.

IATSE petitions for our review of the Board's decision, and the Board cross-applies for enforcement. First, IATSE argues the Board lacked jurisdiction over employer SMG Pershing. Second, it contends that it did not operate exclusive hiring halls with respect to either SMG Pershing or Freeman. Third, IATSE argues that it did not violate the NLRA by removing individuals from its referral list, failing to refer the two employees to a February 2013 job, or prioritizing members over nonmembers. Finally, IATSE contends that the Board's charge of discriminatory referrals was time-barred.[1]

---

[1]In its opening brief IATSE also raises an argument regarding the remedy imposed. In its reply, IATSE agrees with the Board that it will handle this issue with the Board at a later time.

## II. *Discussion*

### A. *Standard of review*

We review the Board decision for substantial evidence on the record as a whole. *Midwest Precision Heating & Cooling, Inc. v. N.L.R.B.*, 408 F.3d 450, 457–58 (8th Cir. 2005) (citations omitted). Credibility determinations are also considered under the substantial evidence test. *Id.* at 457. We will not displace the Board's choice between two fairly conflicting views, even if we would have made a different choice had the matter been before us de novo. *Id.* at 458 (citation omitted). Instead, we afford great deference to the Board's credibility determinations, "and will not overturn them unless they shock the conscience." *N.L.R.B. v. RELCO Locomotives, Inc.*, 734 F.3d 764, 787 (8th Cir. 2013) (citation omitted). Finally, we defer to the Board's conclusions of law in construing the NLRA, so long as "they are based upon a reasonably defensible construction of the Act." *JCR Hotel, Inc. v. N.L.R.B.*, 342 F.3d 837, 841 (8th Cir. 2003) (citation omitted).

### B. *Jurisdiction over SMG Pershing*

We first consider whether the Board has jurisdiction over employer SMG Pershing. By statute, "[t]he Board is empowered . . . to prevent any person from engaging in any unfair labor practice . . . affecting commerce." 29 U.S.C. § 160(a). We have noted that "Congress gave and intended to give the Board the fullest possible jurisdiction under the commerce clause of the Constitution." *N.L.R.B. v. Erlich's 814, Inc.*, 577 F.2d 68, 70 (8th Cir. 1978) (citations omitted). The Board has also imposed discretionary jurisdictional standards upon itself. *See id.* The Board will exercise discretionary jurisdiction over a non-retail enterprise if the enterprise has a gross outflow or inflow of $50,000 across state lines. *N.L.R.B. v. Jerry Durham Drywall*, 974 F.2d 1000, 1002 (8th Cir. 1992); *see also N.L.R.B. v. Somerville Constr. Co.*, 206 F.3d 752, 754 n.3, 754–55 (7th Cir. 2000).

In assessing whether the $50,000 threshold has been met by a multi-state employer, the Board considers all the employer's locations, not just the particular

location at issue. This has long been the established standard. *Siemons Mailing Serv.*, 122 N.L.R.B. 81, 84 (1958) ("[T]he Board will continue to apply the concept that it is the impact on commerce of the totality of an employer's operations that should determine whether or not the Board will assert jurisdiction over a particular employer. Accordingly, the Board will continue its past practice of totaling the commerce of all of an employer's plants or locations to determine whether the appropriate jurisdictional standard is met." (footnote omitted)).

IATSE says it is improper for the Board to consider SMG as a whole in the jurisdictional analysis because the alleged violations are only relevant to SMG's Pershing location. The general manager for SMG's two Lincoln, Nebraska locations testified as to SMG's business operations. He stated that SMG "manages over 200 different facilities across the country and across the world." J.A. vol. I, 50. And he was asked, "[i]n your position as general manager for SMG, are you familiar with whether or not the company has purchased greater than $50,000 worth of services from entities outside the State of Nebraska within the last 12 months?" *Id.* The manager answered in the affirmative. *Id.*

On this record, we hold that the Board has jurisdiction over SMG Pershing. We acknowledge the seeming discrepancy in the Board's consideration of *all* of SMG's locations for jurisdictional purposes, but *only* SMG Pershing for the purposes of the charge. But IATSE has provided no legal authority that the Board's use of SMG's activities outside of Pershing was error. And the Board followed its own discretionary jurisdictional guidelines. The ALJ, in her decision, referenced the local SMG general manager's testimony that SMG has purchased services in excess of $50,000 from outside of Nebraska within the previous year. The Board adopted the ALJ's use of this testimony. The Board's opinion stated, "[i]t is irrelevant whether [the $50,000] amount applies to SMG globally or only SMG/Pershing," and it cited the established law dictating that the Board consider the impact on commerce of all the employer's plants or locations. *Int'l All. of Theatrical Stage Emps., Moving Picture Techns.,*

-5-

*Artists & Allied Crafts of the United States, Its Territories & Canada Local No. 151 (Smg & the Freeman Cos. d/b/a Freeman Decorating Servs., Inc.) & Katie M. Martens (IATSE Local No. 151)*, 2016 WL 4548855, at \*9, 364 N.L.R.B. No. 89 (Aug. 26, 2016) (citing *Siemons Mailing Serv.*, 122 N.L.R.B. at 84). We hold that the Board's conclusion that it had jurisdiction over SMG Pershing is supported by substantial evidence.[2]

## C. *Exclusivity of Hiring Halls*

We first address whether IATSE operated an exclusive hiring hall with respect to Freeman and SMG Pershing. As the Board has previously explained:

> A union's duty of fair representation derives from its status as the exclusive bargaining representative of employees in a specified unit. *Miranda Fuel Co.*, 140 NLRB 181 (1962), enf. denied 326 F.2d 172 (2d Cir. 1963). Where a union has a nonexclusive referral arrangement with an employer, the union has no exclusive status relating to potential employees. Individuals can obtain employment either through the union's hiring hall or through direct application to the employer. Without the exclusive bargaining representative status, the statutory justification for the imposition of a duty of fair representation does not exist. Accordingly, no duty of fair representation attaches to a union's operation of a nonexclusive hiring hall. *See Laborers Local 889 (Anthony Ferrante & Sons)*, 251 NLRB 1579 (1980).

---

[2]We note that even if the discretionary jurisdictional threshold were not met, "[w]here statutory jurisdiction exists, as it clearly does here, the Board has the administrative discretion to disregard its own self-imposed jurisdictional yardstick." *Erlich's 814*, 577 F.2d at 71 (citations omitted). When the Board disregards this self-imposed guideline, we do "not intervene unless compelled to do so by extraordinary circumstances, or unless the Board has abused its discretion." *Id.* (citations omitted).

*Teamsters Local 460 (Superior Asphalt)*, 300 N.L.R.B. 441, 441 (1990). Determining whether a hiring hall is "exclusive" is crucial. The Supreme Court has defined "exclusive" as it pertains to hiring halls as follows:

> The word "exclusive" when used with respect to job referral systems is a term of art denoting the degree to which hiring is reserved to the union hiring hall. Hiring is deemed to be "exclusive," for example, if the union retains sole authority to supply workers to the employer up to a designated percentage of the work force or for some specified period of time, such as 24 or 48 hours, before the employer can hire on his own.

*Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 71 n.1 (1989) (citation omitted). Thus, *all* hiring authority need not be reserved to the union for a hiring hall to be considered "exclusive." An exclusive hiring hall can exist where the employer has the right to hire a certain number or certain percentage of the employees on a job. *Carpenters Local 608 (Various Emp'rs)*, 279 N.L.R.B. 747, 754 (1986). A hiring hall may be exclusive even if the employer obtains personnel on its own "on a minimum number of occasions when the Union [] exhaust[s] its referral list." *Theatrical Wardrobe Union Local 769, IATSE (Broadway in Chi.)*, 349 N.L.R.B. 71, 73 (2007). Likewise, a hiring hall may be exclusive even where the employer can reject any applicant referred. *Ironworkers Local 843, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, AFL-CIO*, 327 N.L.R.B. 29, 30 (1998).

Even if a collective bargaining agreement (CBA) does not require employers to hire only those employees recommended by the union, the parties' past practice can nevertheless demonstrate exclusivity. *N.L.R.B. v. Moving Picture & Projection Mach. Operators Union, Local No. 143*, 649 F.2d 610, 612 (8th Cir. 1981). For example, an employer's practice of hiring only job-seekers recommended by the union, and not hiring job-seekers not referred by the union, evidences an exclusive hiring hall. *N.L.R.B. v. Teamsters "Gen." Local Union No. 200*, 723 F.3d 778, 785 (7th Cir.

2013). The Board can infer a de facto exclusive hiring hall from an implicit understanding between a union and an employer. *Id.* (citation omitted). An employer's credited testimony "that a de facto exclusive hiring hall arrangement existed" supports the finding of an exclusive hiring hall. *Laborers Local 135 (Bechtel Corp.)*, 271 N.L.R.B. 777, 779 n.8 (1984).

### I. *Exclusive Hiring Hall With Respect to Freeman*

The Board found that IATSE operated an exclusive hiring hall with respect to Freeman. IATSE and Freeman entered into CBAs containing the following language: "The Employer agrees that the work described above shall be performed only by qualified workers assigned by the Union through its job referral procedure." *IATSE Local No. 151*, 2016 WL 4548855, at *9. Freeman's sales manager, Scott Young, testified that his practice tracks this language. He always requests IATSE to provide workers. IATSE, in response, identifies conflicting testimony; however, the Board credited Young's testimony on this point. Some evidence showed that Freeman occasionally uses its own foremen to oversee the labor, may reject a referred worker, and can hire other employees if IATSE cannot fill Freeman's needs. These exceptions do not make an otherwise exclusive referral arrangement nonexclusive. *Carpenters Local 608*, 279 N.L.R.B. at 754; *Theatrical Wardrobe Union Local 769*, 349 N.L.R.B. at 73; *Ironworkers Local 843*, 327 N.L.R.B. at 30.

Before the Board, IATSE contended that the CBAs were not valid. IATSE noted that its constitution and bylaws require that CBAs be ratified by the members and that there was evidence that they had not been so ratified. But the Board concluded there was "no credible evidence to show that it was a requirement or standard practice for the membership to ratify all contracts (or any contracts) that the executive board entered into on behalf of the Respondent." *IATSE Local No. 151*, 2016 WL 4548855, at *9. We agree. The Board credited a former IATSE business agent's testimony that contracts were never put up for a ratification vote by the membership. It also relied on corroborating testimony that it was not IATSE's normal

practice to put contracts before the general membership for a ratification vote. The ALJ believed this testimony, and we afford that credibility determination great deference. *RELCO Locomotives, Inc.*, 734 F.3d at 787.

Even discounting the validity of the written agreements, the parties actually operated in accordance with the agreements' terms. The Board concluded "the job referral practice was carried out by Freeman according to the terms of the agreement and, except in rare circumstances, workers were not hired outside of the referral system." *IATSE Local No. 151*, 2016 WL 4548855, at *9. An exclusive hiring hall can be inferred from the implicit understanding between IATSE and Freeman. *See Teamsters "Gen." Local Union No. 200*, 723 F.3d at 785. Moreover, Young's testimony regarding exclusivity supports the finding of an exclusive hiring hall. *Laborers Local 135 (Bechtel Corp.)*, 271 N.L.R.B. at 779 n.8. Based on the parties' practice, and Young's credited testimony that Freeman abides by the CBA's exclusivity provision, an exclusive hiring hall can be inferred. The Board's finding that the IATSE operated an exclusive hiring hall with respect to Freeman is therefore supported by substantial evidence.[3]

### ii. *Hiring Hall with Respect to SMG Pershing*

The Board found that IATSE operated an exclusive hiring hall with respect to SMG Pershing. There was no CBA between IATSE and SMG Pershing. To reach its decision, the Board instead relied on testimony showing the "practice of SMG/Pershing utilizing labor referred through [IATSE] before obtaining labor elsewhere." *IATSE Local No. 151*, 2016 WL 4548855, at *9.

The law is clear that the parties' practice alone can provide the required evidence to demonstrate exclusivity. *Moving Picture & Projection Mach. Operators*

---

[3]At oral argument, IATSE's counsel conceded there was likely an exclusive hiring hall with respect to Freeman.

-9-

*Union, Local No. 143*, 649 F.2d at 612. IATSE presented testimony that SMG Pershing did not exclusively use workers referred by IATSE, but the ALJ largely discredited this testimony. IATSE member Brian Wait testified that he had previously worked jobs for SMG Pershing without being referred by IATSE. But the ALJ explained that it did

> not find [Wait's] testimony on these points persuasive because it lack[ed] specificity about when he worked the events, if SMG was the management company, how many laborers he worked with on those jobs, the percentages that were union workers, the members that were hired directly by SMG, the Respondent, or another source. Equally important, Wait failed to establish that he had direct knowledge regarding how each person was hired to work the aforementioned events.

*IATSE Local No. 151*, 2016 WL 4548855, at *9. In addition to Wait, IATSE member Sheila Brunkhorst admitted she worked for SMG Pershing after she was suspended from IATSE's referral list, but as the Board argues and the ALJ observed, this particular job initially was scheduled at an outdoor venue, then it was moved to the Pershing Center as a last minute emergency substitution. This isolated instance does not negate the exclusivity typically evident in their dealings.

The record evidence supports the Board's conclusion that SMG Pershing hires its labor through IATSE. Lorenz, the SMG Pershing general manager, testified that SMG Pershing obtains all its labor through IATSE and has never hired elsewhere. This testimony alone could establish exclusivity. *Laborers Local 135 (Bechtel Corp.)*, 271 N.L.R.B. at 779 n.8. Lorenz's testimony was corroborated by SMG's Lincoln, Nebraska production manager. On appeal, IATSE points to testimony by IATSE business agent Perry Gillaspie, who testified that SMG Pershing does not have to call IATSE first before hiring elsewhere and could hire whomever it wanted. But, again, the ALJ did not credit Gillaspie's testimony on this point, but Lorenz's. She was

entitled to make this credibility determination by choosing between two fairly conflicting views. On this record, we will not disturb this finding on appeal. *Midwest Precision Heating & Cooling, Inc.*, 408 F.3d at 458.

The Board noted that there was a "Letter of Understanding" in effect between IATSE and SMG Pershing. This Letter of Understanding expired in 2012, but Lorenz testified that even after it expired, IATSE and SMG Pershing continued to operate under the same terms. This letter stated in part, "NON-EXCLUSIVE SERVICE PROVIDER: On those occasions when Local 151 cannot meet the staffing demands of an event, Pershing / SMG will supplement Local's call with its own personnel or with another service provider." J.A. vol. III, 236.[4] This letter—even though purporting to describe a "non-exclusive" provider—supports the finding of exclusivity. It shows that the parties agreed SMG Pershing would use IATSE to staff events, but it could *supplement* with other personnel *if* IATSE could not sufficiently supply employees. Even if SMG Pershing supplemented with other workers when IATSE could not meet the staffing demands of an event, such atypical supplementation does not preclude an exclusivity finding. *Theatrical Wardrobe Union Local 769, IATSE (Broadway in Chi.)*, 349 N.L.R.B. at 73.

The Board's finding of exclusivity rested largely on credibility determinations, which do not shock the conscience and will not be disturbed on appeal. *See RELCO Locomotives, Inc.*, 734 F.3d at 787. Its finding of an exclusive hiring hall between IATSE and SMG Pershing is supported by substantial evidence.

---

[4]IATSE raises the same argument regarding the membership's alleged failure to ratify the Letter of Understanding. This argument fails for the reasons explained in Part II.C.i, *supra*.

-11-

D. *Alleged NLRA Violations*

Under the NLRA, it is an unfair labor practice for a labor organization to "restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1). Section 157 guarantees, among other things, the right to engage in union activities or refrain from union activities. *Id*. § 157. The NLRA also makes it an unfair labor practice for a labor organization "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3)." *Id*. § 158(b)(2). Section (a)(3) prohibits, among other things, "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id*. § 158(a)(3).

These provisions impose upon labor organizations "a statutory duty of fair representation." *Breininger*, 493 U.S. at 73. Exclusive hiring halls must operate consistent with that duty. *Id.* at 78. Exclusive hiring halls "are not illegal *per se* under federal labor law, but rather are illegal only if they in fact result in discrimination prohibited by the NLRA." *Id.* According to the Supreme Court:

> The Board has held that "any departure from established exclusive hiring hall procedures which results in a denial of employment to an applicant falls within that class of discrimination which inherently encourages union membership, breaches the duty of fair representation owed to all hiring hall users, and violates Section 8(b)(1)(A) and (2), unless the union demonstrates that its interference with employment was pursuant to a valid union-security clause or was necessary to the effective performance of its representative function."

*Id.* at 75 n.3 (citations omitted). "[A] union cannot operate a hiring hall to discriminate based on an employee's lack of union membership." *Stagehands Referral Serv., LLC*, 347 N.L.R.B. 1167, 1170 (2006) (citations omitted); *see also* 29 U.S.C. § 157. When an exclusive hiring hall is used and the Union "prevents an

employee from being hired or causes an employee's discharge," the Board adopts a rebuttable presumption that the effect is to encourage union membership. *Stagehands Referral Serv.*, 347 N.L.R.B. at 1170 (citation omitted). The union can rebut this presumption if it shows that the "conduct was necessary for effective performance" in representing its constituency. *Id.* (citations omitted).

We now turn to IATSE's challenge to the three alleged NLRA violations.

### i. *Suspensions from the Referral List*

IATSE suspended seven members from receiving referrals for a year beginning in February 2013. Their removal from the list prevented them from being hired. IATSE thus bore the burden to show that the suspensions were necessary to enable effective performance in representing its constituency. *Stagehands Referral Serv.*, 347 N.L.R.B. at 1170. The Board found that the reasons IATSE gave for these suspensions were not credible or were contradicted by record evidence. Thus, as the Board concluded, IATSE failed to show the suspensions were necessary for effective constituent representation.

IATSE argues, and presented testimony at trial, that there were many reasons the seven members were suspended. It emphasizes the decision was applied uniformly to "all members engaging in the conduct that would damage IATSE's relations with the employers." Pet'r's Br. 36. IATSE says that, broadly speaking, the seven individuals were suspended "for (1) violating work rules, (2) misconduct, and (3) egregious conduct that affected the entire bargaining unit." *Id.* at 37. The difficulty with IATSE's argument is that six of the seven suspension letters include among the reasons bringing lawsuits against the union without first exhausting internal union remedies. J.A. vol. III, 375–82. IATSE argues, and presented testimony at trial, that the suspensions were necessary because the lawsuits damaged IATSE's business relationships. The Board explicitly rejected this contention as not credible. *IATSE Local No. 151*, 2016 WL 4548855, at *9 ("[IATSE's] contention that it 'legitimately

-13-

perceived it was in danger of losing those contracts' is not credible."). The Board based its credibility conclusion on testimony from companies that conducted business with IATSE. These companies stated that their awareness of the lawsuits did not affect their business relationships with IATSE.

Moreover, as the Board pointed out, most of the reasons given in the letters were also protected activity under the NLRA. *See Automatic Screw Prods. Co.*, 306 N.L.R.B. 1072, 1072 (1992), enfd. mem. 977 F.2d 582 (6th Cir. 1992) (holding that employees' discussions about wages are inherently concerted). In short, because IATSE removed the seven members from the referral list, thus interfering with their employment status, the burden was on IATSE to show that suspending these members was necessary for effective performance of representing its constituency. *See Stagehands Referral Serv.*, 347 N.L.R.B. at 1170. Substantial evidence supports the Board's finding that IATSE failed to make this showing. Such evidence also supports the Board's finding that IATSE violated section 8(b)(1)(A) and (2) of the NLRA by suspending these individuals from the referral list.

ii. *Refusal to Refer Two Members to the Cornhusker Hotel Job*

It is undisputed that IATSE refused to refer Sheila Brunkhorst and Tony Polanka ("Polanka Jr.") to a February 2013 job with Freeman at Cornhusker Hotel. This, of course, prevented Brunkhorst and Polanka Jr. from getting hired. The burden then shifted to IATSE to show that doing so was necessary for effective performance of representing its constituency. *See Stagehands Referral Serv.*, 347 N.L.R.B. at 1170.

IATSE business agent Gillaspie admitted that Brunkhorst and Polanka Jr. were qualified to work the job, but they were not referred because they had visited Complete Payroll—the company responsible for IATSE's payroll—to discuss payroll issues. The ALJ resolved disputed testimony on IATSE's justification for not referring Brunkhorst and Polanka. She explicitly rejected Gillaspie's testimony on

this point because she did not find him credible. The ALJ gave several reasons for this credibility determination, including a lack of evidence that Brunkhorst and Polanka Jr.'s meeting at Complete Payroll was anything but cordial and a lack of credible evidence that IATSE's business relationship with Complete Payroll was negatively impacted by the meeting. We are not persuaded to go behind this credibility determination. *See RELCO Locomotives, Inc.*, 734 F.3d at 787.

IATSE failed to meet its burden that refusing to refer Brunkhorst and Polanka Jr. was necessary to the effective performance of its representative function. *See Stagehands Referral Serv.*, 347 N.L.R.B. at 1170. Substantial evidence supports the Board's decision that the refusal to refer Brunkhorst and Polanka Jr. to the February 2013 Freeman job at the Cornhusker Hotel violated section 8(b)(1)(A) and (2) of the NLRA.

iii. *Prioritizing Members over Non-Members for Job Referrals*

The Board found that IATSE discriminated against nonmembers in maintaining its referral list. Normally, IATSE job referrals are based on qualifications, years of experience, and availability. When Gillaspie became business agent for IATSE, he was not provided a referral list. He was, however, given a list of then-current members who used IATSE's referral hall. Interestingly, when Gillaspie created the new referral list, the first 30 names on the new list were IATSE members. Gillaspie testified that when making referrals, he begins at the top and goes down the list in order. After compiling the initial list, Gillaspie did subsequently add members and nonmembers in the order in which they were chronologically added, but the record is clear that in practice members were prioritized for job referrals. IATSE argues Gillaspie "did the best that he could and acted in the most fair way that he was able with the information he was given," but it cites no law to support that this explanation qualifies as a defense. Pet'r's Br. 53.

The Board found that members were prioritized over nonmembers in violation of the NLRA. *See Stagehands Referral Serv.*, 347 N.L.R.B. at 1170 ("[A] union cannot operate a hiring hall to discriminate based on an employee's lack of union membership.").[5] Based on our review of the evidence, we agree. Substantial evidence supports the Board's finding that IATSE used union membership as a basis for referrals, and prioritized members over nonmembers, in violation of section 8(b)(1)(A) and (2) of the NLRA.

## E. *Timeliness of NLRB Charge*

IATSE's final argument on appeal is that the charge with respect to the referral lists was untimely. Section 10(b) of the NLRA provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." 29 U.S.C. § 160(b). IATSE argues that the allegation pertaining to its referral list procedure with respect to SMG Pershing is time-barred because IATSE did not maintain that referral list in the six months prior to the filing of the amended charge. It says it has not made referrals since early 2013, and the charge regarding the referral list was made in late October 2013. Thus, more than six months passed between the allegedly illegal practice and the charge.

The ALJ, whose opinion the Board adopted on this issue, detailed her reasons for rejecting this argument. Specifically, the ALJ found that IATSE did not stop exercising control over the referral process in early 2013.

_____

[5]As the Board noted, this conclusion is bolstered by Gillaspie's initial affidavit. Gillaspie initially stated by affidavit that when he gets a request to refer workers, he *first* goes down the list of local members; *then* contacts other local unions; *then* goes through his "casual or extra list," meaning a list of nonmembers. J.A. vol. I, 21, 23. Gillaspie tried to go back on this statement and testified at trial that he misspoke and he actually goes through a list of members and nonmembers alike. The ALJ did not find this correcting testimony credible, partly because it was in response to leading questions by counsel.

-16-

In February or March 2013 Complete Payroll hired Gillaspie as its labor director. IATSE contends that at this time Gillaspie stepped down from IATSE's referral committee (the group responsible for putting together a list of qualified individuals), and Complete Payroll took over the referral function entirely. But after his hiring at Complete Payroll, Gillaspie continued to represent IATSE as well: he continued to serve as IATSE's business agent through the time of trial. And after beginning to work for Complete Payroll, he continued to decide job referrals. He answered affirmatively when asked if he is "still the individual who makes the decision as to who is going to be referred to a job, whether that's as the business agent or as the labor director for Complete Payroll." J.A. vol I, 21. The Board's decision noted that Gillaspie's employment contract with Complete Payroll underscored his authority to represent IATSE in its dealings with employers. His responsibilities at Complete Payroll included the following duties:

a. Hire, direct, and supervise the Complete Payroll employees that IATSE Local No. 151 provides to the contractors through IATSE Local No. 151's organization . . . ; and

b. Collect the funds from the contractors that have contracted with IATSE Local No. 151 and who have used Complete Payroll's employees through IATSE Local No. 151's organization.

J.A. vol. III, 301. We agree with the Board's conclusion that Gillaspie's contract simply reinforced his authority to represent IATSE in his dealings with employers.

Finally, the ALJ highlighted Gillaspie's "shifting testimony." *IATSE Local No. 151*, 2016 WL 4548855, at *9. Gillaspie testified, "At some point last year in early spring, I turned [the referral list] over to the referral committee and then they turned it back over to me to be used. So at that point, they took possession of the referral list." J.A. vol. I, 35. The ALJ took this to mean IATSE "maintains control of the referral process but allows Gillaspie, as its agent and Complete's labor director, to

administer those duties." *IATSE Local No. 151*, 2016 WL 4548855, at \*9. Based on Gillaspie's dual roles as IATSE's business agent and Complete Payroll's labor director in interacting with both employees as well as contractors, we conclude the Board's assessment of Gillaspie's testimony is supported by substantial evidence.

IATSE relies solely on Gillaspie's testimony that IATSE no longer maintains a referral list to establish that IATSE ended its referral involvement in February or March 2013. If not credible, this testimony does not invalidate the ALJ's ruling. The ALJ's findings of fact, credibility determinations, and ultimate conclusion, which were all adopted by the Board on this point, are supported by substantial evidence. The Board's conclusion that IATSE's 10(b) defense is without merit is affirmed.

### III. *Conclusion*

We therefore enforce the Board's order and deny IATSE's petition for review.

_____